DICKSON *et al.* v. KEMPINSKY *et al.*, *Appellants.*

1.  Contract : LEASE : MARRIED WOMAN : EQUITY.  A lessor made a lease to a married woman in consideration of one hundred and fifty dollars paid in cash on its execution and of certain covenants contained in the lease and to be performed by her during the term. *Held* that, on the payment of the money and the execution of the lease, the contract became an executed one, and the fact that the lessee, because of her coverture, of which the lessor had knowledge, could not be compelled to perform her personal covenants, would not of itself authorize a court of equity to cancel the lease.

Dickson v. Kempinsky.

2. **Equity** : ANNULLING CONTRACT : FRAUD. Neither old age, disease, mental weakness, inadequacy of consideration nor confidential relations are sufficient of themselves to authorize a court of equity to cancel a contract voluntarily entered into for a valuable consideration ; they are, however, important factors to be considered in determining whether or not the contract was obtained by fraud.

3. —— : —— : ——. Whenever in conscience the existence of a contract cannot be accounted for except as the product of fraud or imposition, it is the duty of a court of equity to declare it fraudulent although actual fraud be not proved.

4. —— : —— : ——. Fraud will be inferred in a contract made with a person of weak mind, although not amounting to imbecility or unsoundness, when the consideration is grossly inadequate, unless it appear that such weak-minded person had an intelligent comprehension of the disadvantageous nature of the contract to himself and intended the benefit to be obtained under it by the other party, or unless the contract can be reasonably accounted for upon some other hypothesis than that of fraud, imposition or undue influence.

5. —— : —— : ——. The evidence in this case reviewed, and the judgment of the trial court, cancelling the lease because obtained from the lessor by fraud, affirmed.

*Appeal from Audrain Circuit Court.*—HON. ELIJAH ROBINSON, Judge.

AFFIRMED.

*Dyer, Lee & Ellis* for appellants.

(1) The lease in litigation is binding on the plaintiffs, notwithstanding the lessee was a married woman. *Lloyd v. Underkofler*, 13 Phila. 160 ; Woodfall's Land. and Ten. 71 ; 1 Taylor on Land. and Ten. (8 Ed.) secs. 105, 107 ; 1 Bishop on Married Women (1 Ed.) sec. 530, p. 364, note 2. (2) There is no such idadequacy of consideration as will, in the absence of imposition or undue influence, warrant the cancellation of the lease. *Green v. Thompson*, 2 Ired. Eq. 365 ; *Knobb v. Lindsay*, 5 Ohio, 468 ; *Harrison v. Guest*, 8 H. of L. 481 ; 6 DeG., M. & G. 424 ; *Phillips v. Stewart*, 59 Mo. 491 ; *Osgood v. Franklin*, 1 Johns. Ch. 23, 24 ; *Graham v. Pancoast*,

30 Pa. St. 89 ; 2 Pom. on Cont. p. 428, sec. 926 ; 2 White and Tudor's Lead. Cas. in Eq. (4 Am. Ed.) part 2, p. 1241. (3) To warrant the cancellation of the lease on account of the mental condition of the lessor, Farnsworth, at the time of its execution, must have been incapable of comprehending the contract. 2 White and Tudor's Lead. Cas. in Eq. part 2, p. 1242 ; *Graham v. Pancoast*, 30 Pa. St. 89 ; *Miller v. Craig*, 36 Ill. 109 ; *Lindsey v. Lindsey*, 50 Ill. 79 ; *Mann v. Betterly*, 21 Vt. 326 ; *Darnell v. Rowland*, 30 Ind. 342 ; *Nace v. Boyer*, 30 Pa. St. 99. (4) In the case at bar there was no evidence whatsoever of even weak mental condition, or impairment of mind, on the part of Farnsworth. Mental condition and even insanity caused by violent disease, or any temporary or special cause is not presumed to even continue, after it once exists ; much less can it be presumed to ante-date the proof of its existence. Buswell on Insanity, 213 ; *Hix v. Whettemore*, 4 Metc. (Mass.) 545 ; *Hall v. Ungar*, 4 Sawyer C. C. 672 ; *Clark v. Sawyer*, 3 Sandf. Ch. 351 ; *Carpenter v. Carpenter*, 8 Bush (Ky.) 283 ; *Brown v. Riggin*, 94 Ill. 560 ; *Aurentz v. Anderson*, 3 Pitt. Rep. 310.

*Macfarlane & Trimble* and *Sol. Hughlett* for respondents.

(1) The allegation of fraud stated in the petition is sufficiently definite to admit all the facts and circumstances tending to prove imposition and undue influence. Story's Eq. Plead. (9 Ed.) sec. 252 ; *See v. Cox*, 16 Mo. 166 ; *Gates v. Watson*, 54 Mo. 585. It is not necessary to state the facts and circumstances by which the fraudulent matters relied on are to be proved. *Railroad v. Henry*, 41 Mo. 271. Even a general charge of fraud would be good after verdict. 1 Greenl. Ev. (14 Ed.) sec. 252 ; R. S. 1879, sec. 3582 ; *State v. County*, 51 Mo. 522 ; *Wellshear v. Kelly*, 69 Mo. 348. (2) The lease in question, being made to a married woman, and being executory as to her covenants, was void as to her. If

the covenants in the lease could not be enforced against defendant, then there was no reciprocity or mutuality, and plaintiff had the right to rescind upon equitable terms. *Neef v. Redmon*, 76 Mo. 196 ; *Walker v. Owens*, 79 Mo. 564 ; *Shroyer v. Nickel*, 55 Mo. 264 ; *Music v. Dodson*, 76 Mo. 624 ; *Davis v. Smith*, 75 Mo. 219 ; 2 Bishop on Married Women, sec. 250 ; *Bauer v. Bauer*, 40 Mo. 61 ; *Higgins v. Peltzer*, 49 Mo. 152. The lessee only acquired an executory interest in the land. *Austin v. Coal Co.*, 72 Mo. 541 ; *Michua v. Walsh*, 6 Mo. 348. (3) Inadequacy of consideration becomes controlling when connected with other circumstances of fraud. *Railroad v. Brown*, 43 Mo. 294 ; *Durfee v. Moran*, 57 Mo. 379 ; 1 Sugden on Vend. 204, 261 ; *Day v. Newman*, 2 Cox Ch. 77 ; *Osgood v. Franklin*, 2 Johns. Ch. 23 ; *Seymour v. Delaney*, 6 Johns. Ch. 222 ; *Stoffel v. Schroder*, 62 Mo. 147 ; *Holmes v. Fresh*, 9 Mo. 201 ; *Cadwallader v. West*, 48 Mo. 483 ; *Street v. Goss*, 62 Mo. 229. Inadequacy of consideration, coupled with inequality of parties contracting, or other incidents of fraud, will justify a court of equity in interposing its relief. 2 Pom. Eq. secs. 926, 927. (4) Defendant's husband being the agent of Farnsworth, in charge of these lands at the time, created such a relation of confidence between the parties that the transaction should be looked upon with suspicion, and the burden is upon the defendants to show that he gave to his principal the same advice as a disinterested adviser would have done ; that he acted honestly and fairly throughout, and also that the consideration was fair and just. Bigelow on Fraud, p. 222, sec. 3 ; *Torrey v. Bank*, 9 Paige, 648 ; *Gardner v. Ogden*, 22 N. Y. 341 ; *Massey v. Young*, 73 Mo. 260 ; *Pomeroy v. Benton*, 57 Mo. 531 ; *Bradshaw v. Yates*, 67 Mo. 221 ; *Henriod v. Neusbaumer*, 69 Mo. 96 ; Story's Eq. Jur. secs. 309, 315 ; *Street v. Goss*, 62 Mo. 229 ; *Cadwallader v. West*, 48 Mo. 483 ; *Garvin v. Williams*, 44 Mo. 465 ; *Green v. Church*, 82 Mo. 652 ; *Bridwell v. Swank*, 84 Mo. 456.

BRACE, J.—Edward A. Farnsworth owned two tracts of land in Montgomery county one of which contained eight hundred acres, and the other four hundred and forty acres. On the twenty-fourth day of September, 1877, said Farnsworth leased the eight hundred-acre tract to one Summers, the term to expire on the first day of January, 1886. On the second day of April, 1878, he leased the four hundred and forty-acre tract to defendant S. A. Kempinsky for a term ending on the second of April, 1888. No money rent was reserved in either of these leases. In the lease made to Summers, the lessee covenanted to erect a dwelling worth four hundred dollars, and a barn worth two hundred dollars, on the land, make one good cistern, two good ponds, set out two hundred fruit-trees, the first year, and keep them in good condition, fence the whole tract with a good fence, and leave the place with a good fence that will turn stock, and to pay all taxes accruing after Jan-1, 1878, during said term. In this lease the right was reserved to defendant A. Kempinsky to have firewood off the land. In the lease to defendant S. A. Kempinsky of the four hundred and forty-acre tract, she agreed to build on said land one house with four rooms, one stable, set out one hundred fruit-trees and twenty-five shade-trees, make one well, one pond, fence the land and pay taxes, and maintain and keep in repair all the buildings and fences belonging to said premises.

On the seventh of April, 1879, said Farnsworth executed another lease of both tracts to defendant S. A. Kempinsky for the term of ten years, the eight hundred-acre tract for ten years from the first of January, 1886, and the four hundred and forty-acre tract for ten years from the second day of April, 1888. In this lease, it was expressed that a money consideration of one hundred and fifty dollars was paid; the further consideration was that Mrs. Kempinsky covenanted to build on the land, a one-story frame house with two rooms, a

log or board stable, plant two hundred fruit-trees and twenty-five shade-trees, make one pond, dig one well or cistern, pay all taxes on the land and enclose all of it with a good substantial fence on or before the expiration of the lease, and maintain and repair all the buildings and fences belonging to said premises, or which may, at any time during the term, be erected thereon as they shall be at the commencement of the term of said lease, said buildings and improvements to be erected upon such part of said premises as said Farnsworth may elect, and to be completed one year before this lease expires. Farnsworth died on the twenty-seventh of April, 1879. By his will, executed on the thirteenth of July, 1876, he devised his estate to his only child Barbara Dickson, the plaintiff. She, in February, 1884, commenced this suit to cancel and annul said lease of date April 7, 1879, on two grounds, first, because said S. A. Kempinsky, at the time the lease was made, was a married woman and incapable for that reason of binding herself by contract; second, because the consideration for said lease was grossly inadequate, and at the time of the execution thereof the said Farnsworth, by reason of old age and disease, producing weakness and imbecility of mind, was incapable of making said contract, or of transacting business or managing his property, and the said defendant A. Kempinsky, by taking advantage of his imbecility and helpless mental condition, fraudulently induced and procured the said Farnsworth to execute said lease to his wife, the said S. A. Kempinsky. The answer admitted the execution of the lease, denied the other allegations of the petition and set up that the said S. A. Kempinsky had a large separate estate. On the trial the decree was for the plaintiffs, and orders the said lease to be cancelled upon repayment to defendants of the sum of one hundred and fifty dollars, with interest, from which the defendants appeal.

I.   The lessor, by the cash payment of one hundred and fifty dollars, made by the lessee at the time the lease was executed, received all the consideration he contracted for up to the time this suit was instituted. By the delivery of the lease, and the receipt by the lessor of the cash payment, the contract between them became an executed contract.   It rested upon a valuable consideration and it may be conceded, in the absence of fraud, that the fact that a part of the consideration for the lease consisted of covenants in the lease to be performed· by the lessee during the term, which she might not thereafter perform, and for her failure, she could not be held personally responsible by reason of her coverture, of which the lessor had knowledge, could not alone afford ground for invoking the power of a court of equity to cancel the lease.   1 Taylor Land. & Ten. secs. 105, 107 ; 2 Bish. Mar. Wom. sec. 250 ; *Neef v. Redmon*, 76 Mo. 195 ; *Walker v. Owen*, 79 Mo. 563 ; *Draper v. Stouvenal*, 35 N. Y. 507 ; *Chamberlain v. Robertson*, 31 Iowa, 409.   The decree rendered by the trial court cannot be sustained on the first ground stated in the petition.

II.   The only remaining question is, whether the evidence is sufficient to sustain the second averment, in which it is in substance charged that the execution of the lease by Farnsworth was procured by defendant A. Kempinsky, the husband of said lessee, by fraud, in terms sufficiently specific to authorize this court, after judgment without any objection having been made in the trial court, at any time, to the petition, to consider any legitimate testimony in the record tending to show that its execution was procured by fraud, imposition, or undue influence.   In determining the question, whether or not it was so obtained, it may be conceded in the start, that neither old age, disease, mental weakness, inadequacy of consideration nor confidential relations are *per se* independent and substantive grounds upon which courts of equity will interfere to relieve a

party from a contract voluntarily entered into for a valuable consideration ; nor will the mere existence of any one or all of these afford sufficient cause for avoiding such a contract　They are only important factors to be considered in determining, in any given case, whether a fraud has been perpetrated.　Fraud in all such cases is the ground upon which courts of equity give relief. Its vermiculations can hardly ever be traced.　All the means by which it accomplishes its purposes can seldom be pointed out, its actual existence is rarely shown by positive evidence.　To discover it, and destroy the web which it may have woven around its deluded victim in the form of a contract, is the peculiar and appropriate exercise of the jurisdiction of courts of equity.

"Whenever in conscience the existence of a contract cannot be accounted for except as the product of fraud or imposition, it becomes the delicate but imperative duty of the chancellor to declare it fraudulent though actual fraud be not proven."　The contract of a person with another known to be *non compos mentis*, not just in itself, or for the benefit of such unfortunate, is *ipso facto et constructione legis* fraudulent, and fraud will be inferred in a contract made with a person of weak mind not amounting to imbecility or unsoundness when the consideration is grossly inadequate, unless it appear that such weak-minded person had an intelligent comprehension of the disadvantageous nature of the contract to himself, and purposed the benefit to be obtained under it by the other party, or upon some reasonable hypothesis founded upon the facts in the case, other than that of fraud, imposition, or undue influence, such contract can be reasonably accounted for.　2 White & Tudor Lead. Cas., part 2, p. 1242 ; 1 Story Eq., secs. 227, 228, 234, 235, 236, 237, 244, 246 ; 2 Pom. Eq. 926, *et seq.*

In the application of these well-recognized principles to the case in hand, the first inquiry is, was the consideration grossly inadequate ?　By the terms of the

lease, Mrs. Kempinsky was for a term of ten years, commencing at the expiration of the previous leases, to have the use, rents and profits of twelve hundred and forty acres of land improved in the manner provided for in those leases. Such a body of land enclosed, broken and improved in the manner contemplated, from the evidence in the case, would have been worth per annum about one dollar and seventy cents per acre, over two thousand dollars per annum, for the whole term. For this Farnsworth received one hundred and fifty dollars in cash, the covenant of a married woman without estate, so far as the evidence shows, to pay the taxes, keep the improvements and fences in repair during the term, loss by fire, storm and unavoidable accident, and ordinary wear and tear, excepted; one year before the expiration of the term to make improvements of the value of about five hundred dollars, and before its termination to enclose said lands with a good substantial fence. Making the most liberal estimate of the value and extent of the outlay that could be required under the contract, and conceding that all the covenants of the lessee would be performed, Mrs. Kempinsky, for the sum of one hundred and fifty dollars in cash, and an expenditure of five or six hundred dollars for improvements, could for nine years enjoy this estate worth over two thousand dollars per annum without any additional outlay, other than such insignificant amounts as might be required to pay taxes and keep the premises in repair as provided for, and for the whole term an additional outlay for fencing less than the value of the premises for a single year, would satisfy all the requirements of the contract. The whole outlay of the lessee, if it had been made in accordance with the terms of the lease, could not have exceeded, and, in all probability, would have fallen far short of one-sixth of the value of the term granted. This

would have been the consideration received by the lessor if the covenants of the lease had been performed. What he did in fact receive was one hundred and fifty dollars in money, and those worthless covenants of a married woman.   Large deductions may be made from the estimated value of that estate for overestimates and for contingencies that might affect its realization, yet it must be conceded, after all such reasonable deductions are made, the consideration for the lease remains grossly inadequate.

The inadequacy of that consideration is demonstrated in another way not dependent upon the uncertain estimates of witnesses of the value of future rents. It is found in the fact that this same land in the previous leases, in a state of nature, wholly unproductive of any rents, was leased for a like term upon covenants involving a contemplated outlay of more than three times the amount required in this lease, the performance of which was assured to the lessor in the fact that alone by making those improvements could the land be made productive of any value to the lessee.   The expense of a fence, a house, a stable, a well and a pond is by no means the only outlay required to place wild land in a condition for profit by cultivation or by renting.

What was Farnsworth's mental condition at the time the contract was made?   The evidence tends to show that at the time of the execution of his will (July 15, 1876) he was of sound mind, and nothing in the evidence tends to show that he was not in like mental condition up to and including the time when the first lease was executed to Mrs. Kempinsky on the second of April, 1878.   Dr. Hornsby, who had been his physician since 1859, testified that he was a sufferer from *necrosis of the tibia* of one of his legs, and had some peculiarities, but up to the time he last saw him he was entirely competent to transact business; when that was he could not state, whether in 1879 or not.   Marcus A. Wolff, who was his financial agent and intimate friend, and who

was made the executor of his will, and who was intimately acquainted with him for many years, testified that he drew his will. "Up to that time, so far as his financial affairs were concerned, his mind was perfectly clear ; he was one of the most economical and careful men in his business affairs I ever knew ; he was almost penurious in his habits. About a year or more before his death his intellect was feeble ; in other words, his memory did not seem to be as retentive, and he overlooked subjects of business that before that he was very careful about ; he forgot his taxes until a penalty attached to them, when he had money in my hands to pay them with. There were tenants of his who had been his tenants for years who he thought had moved away or died, and when I would tell him the party had paid his rent, he would say, 'oh, yes, I forgot, I was thinking of something else.' After talking to him a few minutes, he would generally come back to the subject and understand it. He had some domestic trouble at home, and his mind would continually revert to that subject in talking about business affairs."

The last time that Wolff saw him was probably on the sixth of April, 1879, the day before this lease was signed. In this condition of mind and body, he left St. Louis on the seventh and arrived about noon of that day at Wellsville, in Montgomery county, went to the office of defendant A. Kempinsky, whose guest and constant companion he remained until noon of the next day, the eighth, when he was taken by Kempinsky to the train going west towards Macon City. During this twenty-four hours sojourn with Kempinsky, this lease was executed. Its terms, in language that can scarcely be misinterpreted, suggests the condition of his mind when it was done. Within the next twenty-four hours he is found (about noon of the following day) fallen at the door of the room in the courthouse of Macon City where the board of equalization was in session. He crawled into the room looking wild and haggard, but weak and

debilitated, prostrate in body and mind. He was picked up, placed in a chair at the table, but did no business, and evidently was in no condition to do business. A day or two later, he is found at the homes of two of his old friends, one a relative, in Monroe county, physically helpless and mentally imbecile, where he lingered until the twenty-seventh of the same month when he died (having only twenty-two dollars in money in his possession) of blood poisoning caused by his chronic disease.

When this contract is analyzed and viewed in the light afforded by the testimony of Farnsworth's mental and physical condition the day before and the day after its execution, the conviction is forced upon the mind that it was the product of fraud or imposition upon a diseased mind, a conclusion irresistible unless something is to be found in the previous transactions of Farnsworth, the circumstances attending its execution, the relations of the parties or the condition of his mind on the day of its execution, by which it may be accounted for on some other reasonable hypothesis. We have seen that the previous leases, in their consideration, furnish no presumption to weaken the force of this conclusion and these are the only transactions suggested to that end. In fact, in view of the condition in which his land was placed by those leases, this one, by a man of his age and health whose lands were disposed of satisfactorily for a period beyond which he could not in reason hope to live, could only give occasion for surprise and astonishment even if made for a confessedly adequate consideration. In the relation he sustained to the Kempinskys, nothing is discovered to lead to the belief that they had any claims on, or were likely to be recipients of, his bounty, while the confidence he is shown to have placed in the husband, at least invites a careful scrutiny of the circumstances attending the execution of the contract, and of the testimony as to the condition of his mind at that time. For these circumstances resort must be had principally to the evidence

of Kempinsky, from which it appears that he was a real-estate agent; that officing with him was a notary public named Brandt; that Farnsworth was in the habit annually of visiting Montgomery county to see after his lands, and pay his taxes, and of coming to his office; that after the arrival of the train on the seventh of April he came to his office; that after talking about some lands Farnsworth owned in Audrain county, and which he wished Kempinsky to lease for him, they agreed upon the terms of this lease to Kempinsky's wife; that about five o'clock in the afternoon he took Farnsworth in a buggy to his house, distant about a mile from his office, where he stayed until the next day. The lease was prepared by Brandt, by him brought to Kempinsky's house, and that night, after supper, was signed by Farnsworth, to whom he then paid one hundred and fifty dollars, and Brandt asked him if he acknowledged the lease to be his act. This was all done in the presence of several persons besides Brandt (who died before the trial), and whose names the witness gives, but none of whom were called as witnesses. Nor does any witness testify of whom it can be said with any degree of certainty that he conversed with Farnsworth on the seventh except Kempinsky, who says that Farnsworth was then well except his sore leg and in good mental condition.

The next morning Farnsworth was taken to Kempinsky's office in a buggy where the lease was read to him by Brandt, who then wrote the certificate of acknowledgment on it. About noon he was taken to the train in a wagon with Kempinsky, and departed on his last journey. During the twenty-four hours that he was in Wellsville, he transacted no business with any one except Kempinsky, and during that period no communication was had with him by any one without the shadow of Kempinsky's presence.

Of the other nine witnesses who, it is claimed, saw and talked with him at intervals during that period,

and whose testimony is relied upon to show that Farnsworth was then of sound mind, and capable of understanding and transacting business, two were evidently testifying to what occurred in interviews previous to that time, probably in 1878. The interview that two others had with him, who were acquainted with him before that time, was of the most casual character in which the salutations of the day were simply passed, and the usual chat interchanged about health, weather, and the prospects of business, and that, with still two others, to whom he was for the first time introduced by Kempinsky, consisted merely of the usual commonplace, characteristic of first introductions. To the first two he appeared to be as formerly, the latter two observed no defect in him, mental or physical, in the few minutes passed by them in his company.

Of the other three, David Leonard, at whose instance Kempinsky had obtained from Farnsworth, the night before, a written consent to the transfer of the Summers lease to his (Leonard's) father, and who saw him at the depot with Kempinsky on the eve of his departure, says: "I talked a little with him; he told me he was glad *we* had got the lease; that Summers had to give it up. He told me to work the land the same as though it was *our* own. I could not see anything wrong about him; I thought he was a man of good business." The remaining two witnesses, Hammock and Simpson, saw Farnsworth in Kempinsky's office at the reading of the lease. Hammock says substantially, "Brandt was reading an instrument to him. I inferred it was a lease; he was a fluent reader; when he got through Farnsworth asked him to read it again, to read it slowly. As near as I can remember I heard Farnsworth say, 'he was endeavoring to get his land in shape so that it would realize something in the near future, he wanted the land in a shape to suit purchasers.' I told him where I had first met him, and in

whose company I was.    He remembered the circum-
stances, but did not remember me as a man.   I did not
speak to him long; he talked as though he understood
his business:   It never occurred to me that he was inca-
pable; did not observe him enough to determine his
mental or physical condition.   I was standing up ;   he
was sitting down.   I have told about all that was men-
tioned."    Simpson, the other witness who was present
at this reading, says :   "Kempinsky gave me an intro-
duction to Farnsworth.   I found him in good business
capacity, and he had Brandt read said lease twice to
him, as he did not thoroughly understand it the first
time."

It thus appears that of the ten witnesses upon whose
testimony reliance is placed to show mental capacity in
Farnsworth, at the time this contract was executed, four
only, Kempinsky, Leonard, Hammock and Simpson, had
anything like an opportunity to form an intelligent
opinion on the subject.   Of the first two, who were the
beneficiaries of the only business he transacted at that
time, the opinion that he was capable of transacting it
was to be expected.   If the other two could have known
that the contract he had executed and that was then being
read to him, was a lease by which an old man, past three
score and ten, in feeble health, who was desirous of get-
ting his lands in shape *so that it would realize some-
thing in the near future*, and in a condition *to suit
purchasers*, was in fact taking that land out of the
market and placing it in a condition so that it would
realize him absolutely nothing for seventeen and nine-
teen years, the process of ratiocination by which they
reached the conclusion that he was in good business
capacity and understood what he was doing, would be a
strange one indeed.   The effect produced on the mind
of an ordinarily rational man by this evidence is, that
neither he nor they understood the meaning and effect
of the contract he was making.

It is much to be feared that Brandt was a too fluent

reader for either of them. However this may be, when we view this feeble-minded and feeble-bodied man, weighed down with old age, disease, and domestic trouble, away from friends and from every one capable of giving him disinterested advice, in the hands of one in whom the evidence shows he had and was placing confidence twenty-four hours only before his mind was plunged into almost utter oblivion, in connection with this unconscionable contract, obtained from him by the one in whom he confided, during the period that he remained his guest, we find nothing in the evidence of these witnesses, in the circumstances which attended the execution of this contract, or in the relations the parties sustained to each other, sufficient to create a reasonable doubt, but that this lease, so far as he was concerned, is either the product of a mind incapable of comprehending its force and meaning, or of a weak one imposed upon. It can be accounted for on no other reasonable hypothesis. Whichever was the case, it is the product of fraud and ought to be cancelled.

The judgment of the circuit court is affirmed. All concur except RAY, J., absent; SHERWOOD, J., in the second paragraph only.