Cutts et al., Appellants, v. Young.

Division Two, February 7, 1899.

1. Fraud: SETTING ASIDE CONTRACT: OLD AGE, ETC.  Neither old age, disease, mental weakness, inadequacy of consideration, nor confidential relations are sufficient of themselves to justify a court of equity in setting aside a contract entered into for a valuable consideration, but each of them is an important factor to be taken into consideration in determining whether or not such a contract was obtained by fraud or undue influence.

2. ———: ———: ———: CASE STATED.  An old man, of unusual intelligence, familiar with the drawing and meaning of deeds, of average condition in body and mind with other men of his age, of his own motion persuaded defendant to agree to take care of him and his feeble-minded wife and one imbecile son during their natural lives in consideration of a conveyance to him of a small farm. The grantor and his wife died in a few days after the deed was made, and this son and the other heirs of grantor are plaintiffs. *Held,* that there is nothing in the evidence to show that the grantor was incapable of making the deed in question, or that it was obtained by fraud or undue influence on the part of the defendant.

*Appeal from Greene Circuit Court.*—HON. JAMES T. NEVILLE, Judge.

AFFIRMED.

WM. O. MEAD and T. T. LOY for appellants.

There was no consideration paid by the defendant for the deed, and the facts and circumstances proven and surrounding the transaction, establish fraud on the part of the defendant, in the procurement of the deed, and it should be set aside and the land restored to the appellants, heirs of the grantor in said deed.   Dickson v. Kempinsky, 96 Mo. 252.

T. J. Murray for respondent.

(1)   When a party is induced to do in a lifetime what he intended to do at his death the act will not be set aside as effected by undue influence.   Bowles v. Wathan, 54 Mo. 261. (2)   The cancellation or destruction of a deed will not revest the title of the grantee in the grantor though done by mutual consent and with a view to that object.   Tibean v. Tibean, 19 Mo. 78; Parsons v. Parsons, 45 Mo. 265.   (3)   The grantor in a deed may avoid the conveyance by showing that he was *non compos mentis* at the time it was executed, but the mere fact that the mind of a person is impaired by age or disease does not render such person incompetent to make a valid contract.   The legal test is the capacity to understand the nature and effect of the transaction.   If a person understands the nature of the business in which he is engaged and the effect of what he is doing his acts are valid and this is true though the mind of such person may be impaired by age and disease.   Cutler v. Zollinger, 117 Mo. 101; Richardson v. Smart, 65 Mo. App. 14; Keithley v. Keithley, 85 Mo. 217. (4)   The burden is on the party asserting the mental incapacity of the grantor at the time of making the contract or deed. Cutler v. Zollinger, 117 Mo. 92.   (5)   There was no undue influence in this case.   Hollocher v. Hollocher, 62 Mo. 272. (6)   The exercise of undue influence must be such as to destroy the will power and overreach and destroy the free agency of the grantor.   Thompson v. Ish, 99 Mo. 160; Rankin v. Rankin, 61 Mo. 295; Jackson v. Hardin, 83 Mo. 175; Norton v. Paxton, 110 Mo. 456; Pennington v. Stanton, 125 Mo. 658. (7)   The relations existing between William Cutts and Charles C. Young were not confidential.   Taylor v. Crockett, 123 Mo. 300; Maddox v. Maddox, 114 Mo. 35; Pennington v. Stanton, 125 Mo. 658.   (8)   A deed made by an aged person in consideration of an agreement for the grantee to support him is valid and binding.   Pennington v. Stanton, 125 Mo. 653; Keithley v. Keithley, 85 Mo. 217.

BURGESS, J.—The object of this suit is to recover possession of a tract of land now in the possession of defendant. Both parties claim title under William Cutts, deceased, the plaintiffs as his only children and heirs at law, the defendant by deed directly from him.

The petition is in two counts, one in equity to set aside the deed from Cutts to defendant, upon the ground that it was obtained by fraud and undue influence, and the other in ejectment.

The trial was before the court, a jury being waived as to the count in ejectment. There was judgment for defendant upon both counts. The plaintiffs then filed motion for new trial, which being overruled they appeal.

In July, 1895, defendant rented from William Cutts a small farm in Green county, being the same land involved in this litigation. Cutts had a small house built on the farm for defendant to live in. At that time Cutts and his wife, who was then living, were very old, he being over eighty years of age, and she and their son George Cutts being feeble minded.

William Cutts had proposed to defendant that if he would take care of him, his feeble-minded wife and son George, as long as they lived, he would give him the farm in question, which defendant finally agreed to do, and on or about the twentieth day of October, 1895, William Cutts becoming very ill the defendant went for a physician, who told him that Mr. Cutts was not liable to live but a few days. On the next day defendant procured the services of a lawyer and a justice of the peace, and went to the house of Mr. Cutts and from there took him to the house of defendant, where he executed a deed to defendant for the land. They then returned to the house of Cutts when Mrs. Cutts signed and acknowledged the deed. She was then very ill and died within five days thereafter.

There were apparently some irregularities in this deed,

and defendant thinking it prudent to have them corrected, concluded to have Cutts make him another deed, which he did on the thirtieth day of October, 1895. Cutts died the next day thereafter.

The consideration expressed in the deed is $1, care and support of the grantor during his natural life, and an agreement upon the part of the grantee, Charles C. Young, after the death of William Cutts, to apply the rents or their equivalent to the support of his son George T. Cutts during his natural life.

William Cutts was prior to his last sickness a man of more than ordinary intelligence. He was and for some time had been justice of the peace in the county where he resided. As one of the plaintiffs, Russell Cutts, puts it, "up to 1896, or 1897, he was vigorous for an old man." His decline physically and mentally was about as usual in such cases.

J. H. Earnest, a witness for plaintiffs, testified: I knew William Cutts ever since he lived there up to his death, 6 or 7 years, was at his house in his last illness. He was taken sick on Saturday or Sunday, I think, bad, and sent for the doctor on Sunday, and he died the next Thursday night a week— was there on Saturday before he died. When I first went he didn't recognize me. Charley Young told him who I was. I don't remember what he said, he made some excuse some way. It would be hard for me to say whether he was conscious or unconscious; I spoke to him and asked him how he was, and he went on talking with me, but didn't look just right; and Charley Young told him who I was, and he talked on with me an hour or two. I had been his neighbor ever since he moved there, I can't tell how long it was; our farms joined. I saw him frequently and knew him intimately when he was in fair health, he never failed to recognize me before. After I got to talking with him he talked like he knew me and everything, all right. As compared with the old gentleman's mind as displayed when I first became

acquainted with him, it was very much impaired at the time of his last sickness. I don't think his mind was like it was when I first knew him. On cross-examination he stated: At the time I was at Mr. Cutts's on Saturday, I hadn't shaved for two weeks; after Charley Young told Mr. Cutts who I was, he said, "Your beard has grown out so, I didn't know you." He was telling me about how he was, he talked all right. I am on good terms with the Youngs, I reckon; there never has been a cross word between us, that I know of. I had a law suit with old man Middlemass, and Mr. Young was on the jury and decided the case against me. I wasn't mad at him, I was mad at Middlemass.

Mrs. Sarah Earnest, another witness, says: From the time I first knew the old gentleman Cutts, up on to the time he was taken sick, the winter before, he always seemed to be a strongminded old man. He didn't recognize me on one occasion; the morning his wife was buried I went in and took him a glass of jelly and a can of fruit, and he didn't recognize me; said he didn't recognize me; said he didn't know who I was. And Mr. Hardman told him who I was. I put it in his hand and then he said he didn't know who I was. He had been well acquainted with me for 7 or 8 years, I frequently met him and conversed with him. On cross-examination she said: I handed him the jelly and asked him if he would like to have something to eat and he said he would. He said, "I don't know you," and he made some answer that I didn't understand. Mr. Hardman told him who I was, he told him who I was before Mr. Cutts said anything, and then he made some answer, but I didn't understand what it was. I thought about the old man being peculiar before these people got to talking about this case. I thought about it about the time he died.

Donely, another witness, said: The first five or six years I was acquainted with Mr. Cutts, he was a man of good sense. I suppose that during the last year of his life, his mental con-

dition was impaired by age and ill health, his mind was weakened, it was not as strong as it was when I first knew him, on account of his sickness. Just about the ordinary decrease in mental faculties that a man would have by being sick and old. At my last visit he didn't know me, and if he knew anybody I didn't know it.

H. E. Hardman, another witness who knew William Cutts well and visited him a few times during his last illness, stated: "During these visits Mr. Cutts generally recognized me, perhaps, once or twice he didn't, when I first spoke to him; there was one day, on Tuesday, the day his wife was a corpse, I think he lay with his eyes closed a good deal of the time. On Tuesday when he failed to recognize me, he wasn't complaining quite as much as he had been before. He was in bed then." Q. "Was he in a condition at that time, from what you had seen from this Thursday and from then up to Tuesday, to transact business intelligently?" A. "No, he was not in much condition for anything; he seemed to be in his right mind as far as I heard. I couldn't tell whether his mind was impaired or weakened, or not." On cross-examination the witness stated: In the conversation I had with him, when he roused up, he seemed to understand what he was talking about. When I went in, I think he was awake, but had his eyes closed, and didn't notice. I went in and spoke to him, and at that time he called me Mr. Young, or he just thought it was Mr. Young, but he recognized me right away. He never told me anything about what disposition he expected to make of his property. Never told me anything about giving Russell Cutts any money, or letting him have any money to invest and not getting it back.

Albert Hardman, another witness who was present at the time of the execution of the last deed by William Cutts, after stating that Hahn, the justice of the peace, and Charles Young, Sr., and Charles Young, Jr., were there, proceeded: Hahn read the deed and they moved a small stand over in

front of him and he signed it.   He said very little, if any-
thing.   He remarked that he didn't like ————.   He wanted
to know if the other deed had been put on record.   He said he
didn't want it to be; he said it would be rather awkward, and
he did not want anything to go on record that way.   He said
the other was rather awkward, and he didn't want anything
awkward to go on record concerning him, he wanted it to be
right and correct.   Mr. William Cutts said that.   Charley
Young said it never saw the recorder's office.   He produced a
deed which had not been recorded, took it out of his pocket
and gave it to Mr. Cutts.   He said the deed he had signed
the day before yesterday, and referring to that deed, he said,
":the deed I signed yesterday."   And Mr. Young pulled it out
of his pocket and handed it to Mr. Cutts.   I believe he ex-
plained to him that it wasn't the day before, some ten days
before, if I remember correctly.   Mr. Cutts, when handed the
deed, tore it in two twice, and then gave it to Uncle Charley
Young and he put it into the stove and burned it.   I didn't
hear it read.   All that was done by Squire Hahn was just the
reading of the deed over to him, he didn't explain the con-
tents and describe it to him.   He took his acknowledgment;
asked him if it was his free act and deed; and he replied, that
it was his free act and will.   On cross-examination the wit-
ness stated:   All the time that I had seen Mr. Cutts, he had
been a man of ordinary intelligence.   As to whether he under-
stood what he was doing that day, I told you what he done, you
can draw your own conclusion.   I probably stated in my
deposition:   "He did not know what he was doing."   I stated
in my deposition that I didn't see anything to convince me
that he didn't.   He talked rational; seemed to comprehend
the whole thing; knew how to sign his name; knew what he
was doing; understood the deed, when it was read to him, I
presume.   I know of no influence or force or threats used by
this man Young to sign it.   Just told him what he wanted

him to do, and Mr. Cutts got up and did it. Hahn read it to him, I presume he understood it.

*By the Court:*  Q.  "He just read it over and the old man was about as smart as any of you about conveyances?" A.  "Yes, sir, I expect so."

This was substantially all of the evidence adduced by plaintiffs with respect to the condition of the mind of William Cutts at the time of the execution by him of the two deeds to the defendant Young.

On the part of the defendant, Gilbert R. Watson, a witness who had known William Cutts for several years, stated: He was justice of the peace at the time of his death, by appointment; there was but one justice who had been qualified from the previous election. I read the deed that was signed by William Cutts and his wife, to Charley Young. On Saturday evening, about the 19th of October, Charley Young came to my place and we had a conversation. That was on Saturday before the deed was written on Monday following. On Monday morning, the 21st, I went to Charles Young's house, on the Cutts place, Mr. Cutts came there; it was about eight o'clock when I got there. Charles Young, when I got to the place, drove over to old man Cutts's place in a wagon, and they came directly in the wagon, and when he came into the house, we just passed a few words in conversation, and he said, this business he wanted fixed up. Mr. Cutts said that. This business he wanted fixed up, or something like this. He wanted what property he had to support him and his wife during their lives, and then after they were gone he wanted George to have some benefit of it, and that he believed Charley Young was the man to do this; and I asked him what he wanted George to have. Well, he said, that he didn't want him to have anything, that he wasn't competent to take care of it. Charley Young asked him to write the deed, or to go over there. He employed me to write the deed and paid me for it. The old man said that he wanted it so secured to

Charley that he wouldn't be molested thereafter; and I remarked to him that I believed it could not well be managed by a will, and he said he was satisfied of that himself, and said then that I thought the proper way would be to transfer the title by deed. I says, "Do you want the deed then written?" Mr. Cutts said he did. I says, "Now, relative to George; how is it you want him cared for?" Well, he said, he wanted him to have the benefit of the rent, is my recollection, of that land. I says, "In writing this deed, shall I write that after the death of yourself and wife, that Charley Young agrees to apply the rents or the equivalent to the support of your son, George T. Cutts?" And he said, "Yes, write it that way," and I wrote the warranty deed, I wrote it in full; I didn't use the ordniary blank; however, I took that for my guide and just wrote the warranty deed from William Cutts and Margaret A. Cutts, his wife. While I was writing, I remarked that they would get someone to take the acknowledgment, Squire Hahn or someone else, and they went after him and he was there before I got the deed quite finished. When I finished it, I read it to Mr. Cutts and turned it over to him; turned it over to Squire Hahn or William Cutts, I don't remember which, they were both there. My recollection is that he signed it right there and then went over to Mr. Cutts's house for the old lady to sign it; I don't recollect who carried it. I gave it to them there. Hahn, the two Charley Youngs and myself and George Cutts were there at Charley Young's at the time, but went over to Cutts's house. When we got down to the old gentleman's house, William Cutts went in and explained to Mrs. Cutts that it was a deed to Charley Young to take care of them so they wouldn't have to work any more and "will you sign it," is my recollection of the words. I don't remember how his name was signed to the deed. The old lady signed it; she was lying on the bed and with the assistance of William Cutts, I think it was, she raised up and there was a desk put in front of her and she took

the pen, but her hand trembled, and Mr. Hahn then took the pen and wrote her name and she made her mark, I believe. The deed showed me is the one I wrote. This is not the one I wrote that day, but I wrote this. The first one, as I stated, was written in full, using the name of William Cutts and Margaret Cutts as grantors, and in the last it was William Cutts, widower; and then in the agreement there on the part of Charles Young to apply the rents, the singular pronoun was used, whereas the plural was used in relation to George, his son, instead of their son. That is the difference in the deeds except this is written after the description, whereas the other was written after the warranty clause, I believe. I always regarded old man Cutts as rather a remarkably intelligent man of his age, and he talked, I think, with as much understanding as I ever heard him.

W. E. Hahn, a witness, says: I am justice of the peace. I was present at the time William Cutts and his wife signed the deed, on or about October 1st, 1895, I saw William Cutts sign the deed, and saw Mrs. Cutts make her mark, I took their acknowledgment to that deed. I was also present when William Cutts signed the deed on the 30th day of October, 1895. I saw him sign his name to it, and I took his acknowledgment to it. I compared the first deed with the last; the difference in the date; one was dated the 21st day of October, the last one the 30th day of October; and in the second deed the name of the wife was left out and the word widower inserted instead, and the singular was used instead of the plural throughout the deed; and the clause wherein Charles Young agreed to give the rent to George Cutts during his natural life, came in just after the description in the deed. This was the substance of the difference. I don't remember how the first deed was signed; when my attention was called to it, the name of William Cutts was signed to the deed with a scratch after the first letter, Wm.; it was scratched out and William was written there over something that had been scratched, I don't know

what it was. William Cutts had an initial besides the name of William, but I don't know what his middle name was. I have known William Cutts ever since he lived there mostly, have seen him frequently; I was well acquainted with him at the time these deeds were signed; I had no conversation with him more than ordinary business of the kind. The first time I went there, he was sitting just outside the door in a chair, and I went in through the front door and spoke to the old man, and he said something about having some business brought up, I don't remember just how it came out, but anyhow, he said Charley had finally consented to take the place, if he would secure him in some way. Take care of him. That was the deed I took the first acknowledgment to. That is about all I noticed him saying, except after the acknowledgment, he said it was his free act and deed, and he didn't know whether the old woman, as he called her, would sign it or not, they would go over and see. I didn't do anything to induce William Cutts to sign the deed. G. R. Watson didn't say or do anything on that occasion to induce him to sign it, neither did Charley Young, while I was there. The old man Young didn't do anything. George was standing in the door when I read it over. I don't remember that the deed was read over but once that day, and that was before it was signed. I think the old man sat down and read it himself. I didn't hear him explain all of it to his wife, I was behind him. When he signed the second deed, Charles Young and his father and Gilbert Hardman and myself and George Cutts were present. George Cutts was in the door part of the time I was there; I don't know whether he was there just exactly at the time the deed was signed or not. I didn't do anything to induce the old man to sign it. Charley Young didn't do anything, he just asked him something about the mistake in the first deed. The old gentleman said he could either sign the old one over or make a new one, and the old man seemed to

prefer making a new one. Albert Hardman didn't do any-
thing to induce him to sign it.

After stating on cross-examination that Mr. Cutts was
lying down when he went to take his acknowledgment to the
last deed, and that old man Young and Charley went
and raised him up in bed or assisted him to get up, witness
said: They raised him up and I set the table out before him
to sign the deed. He was a little bit nervous, he didn't have
his glasses. He was not more weak and nervous than any
man of his age and in his condition. He was feeble, of course,
tolerably sick. I didn't notice that he was very nervous.
Q. "Did the first deed contain the clause, 'for and in con-
sideration of one dollar and care and support during his nat-
ural life?' A. "No, it contained 'one dollar, care and sup-
port during our natural life.'" The first deed was written on
a blank and I don't remember how it was written, but just
like that deed, except changes in the name. I can't write a
deed out in full without something to go by. It was written
on legal cap, but it was written by a blank just like that, by
Watson, he had that blank to copy from. One just like it;
one printed by Mat Sims here in the city. In the first deed,
this provision here for George Cutts is just as it is in this
deed, is the way I remember it. I remember it being like it
except at a different place in the deed; I have explained that
before. Q. "As a matter of fact, didn't you as acknowl-
edging justice, explain to the old man that this was identically
the same, and just a copy of the other?" A. "No, sir."
Q. "Nobody else explained it to him there?" A. "No, I
read it over myself twice, made no explanation; none neces-
sary. The old man tore the other deed in two two or three
times. Charley Young took that deed out of his pocket and
gave it to the old man Cutts, and he tore it up in his pres-
ence, and the defendant made no objection to his tearing it up.
I don't remember the old man giving the torn up deed to old

man Young to put in the stove.   That was done in the pres-
ence of the defendant and without any objection whatever."

Other witnesses testified upon either side of the case, but
not materially different from what had been set forth.

It is well settled that neither old age, disease, mental
weakness, inadequacy of consideration nor confidential rela-
tions are sufficient of themselves to justify a court of equity
in setting aside a contract entered into for a valuable consid-
eration, but that each and every one of them is an important
factor to be taken into consideration in passing upon the ques-
tion as to whether or not such a contract was obtained by fraud
and undue influence, is equally as well settled.   [Dickson v.
Kempinsky, 96 Mo. 252, and authorities cited.]

That plaintiffs signally failed to prove that their father,
William Cutts, was incapable at the time of its execution of
making the deed sought to be set aside in this proceeding, and
that he did not then know perfectly well what he was doing,
and its nature, and effect, is beyond any and all question.
Even the weight of the testimony adduced by plaintiffs shows
to the contrary, and that the grantor was of more than ordi-
dinary intelligence, and in the possession of his mental facul-
ties at the time of the execution of both deeds.   When he
signed and acknowledged the deed in contest he wanted to
know if the first one had been put upon record, and when he
was informed that it had not been, he replied that "it was
rather awkward to go on record concerning him, and he did
not want anything awkward to go on record concern-
ing him, he wanted it to be right and correct," and
when handed that deed took it and tore it up.
Thus clearly demonstrating that he was familiar with
such instruments, that they were required to be recorded,
and the effect of both their execution and recording.   Nor was
there any evidence whatever that the deed was obtained by
fraud or undue influence.

The consideration for the deed is the only thing we think

in the entire transaction which can be questioned, and when the facts and surrounding circumstances in connection with its execution, and the reasons given by the grantor are taken into consideration any doubt as to the sufficiency of the consideration is dispelled. The grantor and his wife were far advanced in life, in bad health and she very feeble. Beside their son George was also an embecile, and incapable of managing his own affairs, and largely dependent upon his father. Amidst these unpleasant surroundings he determined voluntarily to deed his land to defendant Young, upon the condition that he would take care of and provide for himself, wife and George during their natural lives. Defendant finally consented. When he made the first deed, Mr. Cutts said to Gilbert R. Watson who wrote the first deed, that he wanted the business fixed up. "He wanted what property he had to support him and his wife during their lives, and then after they were gone he wanted George to have some benefit of it; and that he believed Charles Young was the man to do this. Watson then said, I asked him what he wanted George to have. Well, he said that he didn't want him to have anything, that he wasn't competent to take care of it . . . . . . . The old man said that he wanted it so secured to Charley that he wouldn't be molested thereafter; and I remarked to him that I believed that it could not well be managed by a will, and he said that he was satisfied of that himself," and then directed witness how to write the deed, and he wrote it in accordance with his directions. Knowing the infirm condition of himself and wife, and that they could not live much longer, his purpose in making the deed seems to have been to provide a means of support for them, and their son George in their helpless condition during their natural lives, as he said, so that they would not have to work. Whether the mode selected was a wise one or not, is not for our consideration, but certain it is, it was of the grantor's own suggestion and volition.

There is nothing in the record which we think shows that William Cutts was incapable of making the deed in question,

or that it was obtained by fraud or undue influence on the part of the defendant. We are supported in the conclusion reached by the finding of the court below, to whose judgment we must to some extent defer.

We therefore affirm the judgment. GANTT, P. J., and SHERWOOD, J., concur.