McCLURE, *Appellant*, v. LEWIS.

1. **Equity:** PERSONS IN POSITIONS OF CONFIDENCE AND INFLUENCE, HOW THEY MUST DEAL. Whenever there exists between parties confidence on the one hand and influence on the other, from whatever cause they may spring, equity requires in all dealings between them the highest degree of good faith on the part of him in whom the confidence is reposed. If a conveyance is executed by the other in his favor, the burden rests upon him to prove that it was not procured by means of such confidence and influence. It is his duty, before accepting the conveyance, to see that the grantor has disinterested advice and full information.

2. ———: CASE ADJUDGED: ESTOPPEL: ALLOWANCE FOR IMPROVEMENTS. The plaintiff was a single woman, about fifty-two years of age, a confirmed invalid, broken down with disease, both in body and mind, gloomy and hysterical from her bodily ailments and the recent loss of near and dear relatives. She was much attached to defendant's wife, who was her niece, and she lived in defendant's house. Defendant and his wife were very kind to her, and by this means

had acquired influence over her. Under these circumstances she executed conveyances of all her property to defendant for a consideration not exceeding one-eighth of its value. This was done hurriedly, without the knowledge of any friend or relative of plaintiff, (being concealed even from her sister who occupied an adjoining room in defendant's house) without any suggestion from defendant that she should take counsel from others, without giving her time or opportunity to do so if she desired, and without informing her of the value of the property. The deed was drawn under defendant's directions by an attorney who was an entire stranger to the family, though there was a firm, equally convenient, who had always been employed by plaintiff's deceased brothers, from whom she derived her estate and in whom she had great confidence, and once by plaintiff herself. After receiving the conveyances, defendant, with the consent and encouragement of plaintiff, erected a house on part of the property. This was while she still lived with defendant. An estrangement having subsequently arisen, they separated, and plaintiff then brought this suit to set aside the conveyances. *Held*, that they were obtained by undue influence. *Held*, also, that the receipt of the consideration and the acquiescence by plaintiff in the erection of the house did not estop her, because they both took place while she was still under defendant's influence. The conveyances were, therefore, set aside, but defendant was allowed the cost of the house.

*Appeal from St. Louis Court of Appeals.*

REVERSED.

*Cline, Jamison & Day* for appellant.

All contracts between guardian and ward, which are favorable to the guardian and injurious to the ward, are presumptively void. *Garvin v. Williams,* 44 Mo. 465 ; *Yosti v. Laughran,* 49 Mo. 594 , *Cadwallader v. West,* 48 Mo. 483 ; *Ranken v. Patton,* 65 Mo. 378; Perry on Trusts, § 195 ; *Coles v. Trecothick,* 9 Ves. 234 ; *Taylor v. Taylor,* 8 How. 199 ; *Espey v. Lake,* 10 Hare 260. This principle applies to all cases where there is weakness and confidence on the one side, and strength, position and abuse of confidence on the other. *Long v. Mulford,* 17 Ohio St. 484, 509 ; *Todd v. Grove,* 33 Md. 188, 192 ; *Billage v. Southee,* 9 Hare 540 ; Story's Eq., §§ 312, 332 ; *Highberger v. Stiffler,* 21 Md. 350 ;

*Evans v. Llewellin*, 1 Cox's Chan. Cas. 333 ; *Smith v. Kay*, 7 H. L. Cas. 750 ; *Gibson v. Jeyes*, 6 Ves. 266, 278 ; *Butler v. Haskell*, 4 Dessau. 651.

While mere inadequacy of consideration money is not in itself sufficient to set aside a bargain, yet, when there is other evidence of fraud or undue influence, this also becomes evidence of such wrong dealing, and is entitled to consideration. *Baker v. Monk*, 10 Jur. (N. S.) 691 ; *Butler v. Haskell*, 4 Dessau. 651 ; *McCormick v. Malin*, 5 Blackf. 530 ; *Bunch v. Hurst*, 3 Dessau. 273 ; *Dunnage v. White*, 1 Swanst. 137 ; *Wood v. Abrey*, 3 Madd. 418 ; *Dally v. Wonham*, 33 Beav. 154.

*Dryden & Dryden* for respondent, argued that there was nothing in the evidence tending in the remotest degree to prove either actual fraud, or constructive fraud—examining in detail the following questions : 1. Had the plaintiff intrusted her business and property to defendant, as alleged in the bill, or did any relation of trust or confidence exist between them ? 2. Had the plaintiff's mind become so impaired as to render her incapable of taking care of her affairs, or of understanding the nature or value of her property ? 3. Had the defendant acquired a controlling influence over the mind or will of the plaintiff ? 4. Were the deed and lease brought about by constraint or undue influence of the defendant over the mind and will of the plaintiff, or were they the result of the free and unrestrained exercise of the plaintiff's will ? 5. Were the two instruments made without consideration as alleged ? Or were they made upon a valuable consideration, and did the plaintiff know and understand the nature of the business she was engaged in when making them ?

If it were possible from the evidence to arrive at the conclusion that the deed and lease were procured by the improper means charged, yet, nevertheless the plaintiff by reason of laches would not be entitled to equitable relief. *Masson v. Bovet*, 1 Denio 69, 73, 74 ; *Grymes v. Sanders*, 93 U.

S. 62; *Ogilvie v. Knox Ins. Co.*, 22 How. 391; *Gilbert v. Hunnewell*, 12 Heisk. (Tenn.) 289; *Herrin v. Libbey*, 36 Me. 350; *DeArmand v. Phillips*, Walk. Ch. (Mich.) 199; *Lacey v. McMillen*, 9 B. Mon. 525; *Ayers v. Mitchell*, 3 S. & M. 683; *Davis v. James*, 4 J. J. Marsh. 8; *Lawrence v. Dale*, 3 John. Ch. 23; *Landrum v. Union Bank*, 63 Mo. 56.

He who asks equity must do equity. This rule requires that upon the rescission of a contract, whether for fraud or for other cause, the party disaffirming the contract must return whatever he has received upon it. *Masson v. Bovet, supra*; *Tisdale v. Buckmore*, 33 Me. 461; *Herrin v. Libbey*, 36 Me. 350. The bill is faulty in not offering to do equity.

Where a party who seeks to set aside a transaction on the ground of fraud has so dealt with the property as to render it impossible to place the other party *in statu quo*, equity will not relieve. *Anglesey v. Annesley*, 1 Bro. P. C. 289; *King v. Hamlet*, 2 Mylne & Keen 481; *Lacey v. McMillen*, 9 B. Mon. 523. The defendant was induced by the solicitations of the plaintiff to expend large sums in improving the property. Without the return of these with interest, the parties could not be placed *in statu quo*.

HENRY, J.—Lewis is the husband of a niece of the plaintiff, who, after the death of her two brothers, went to live with Lewis and his wife, on a farm in St. Louis county. She had, for many years, been in very delicate health. Her brother John died in the spring, and her brother Francis in the fall, of 1871. She and these brothers, neither of whom had ever married, had lived together for many years, in great love and harmony, and their death seriously affected her, and aggravated the complication of diseases of which she had long been a sufferer. After she went to live with defendant, and while there, she was a great part of the time bed-ridden. Mrs. Gordon, an older sister, mother of Mrs Lewis, also resided with Lewis, and occupied an adjoining room to that of the plaintiff. The plaintiff owned

a tract of 122 78-100 acres of land in St. Louis county, and a valuable lot in the city, of the value of about $16,000. Early in January, 1872, about three months after the death of her brother Francis, she executed a deed, conveying to the defendant all of the above property, reserving to herself a life estate, for the consideration of love and affection, and at the same time leased to the defendant for her life, the entire property at $400 per annum.

This suit was to set aside said conveyance and lease, plaintiff alleging that they were procured through fraud and undue influence. The facts relied upon to establish the allegations, and which were established by the evidence, were, that she was and had been greatly afflicted for a number of years, in consequence of which, together with the recent death of her brothers, betwixt whom and herself there was a very warm attachment, her mind was seriously impaired. While the evidence does not prove that she was insane, or an imbecile, it very conclusively establishes an impairment of the intellectual powers, as a result of long continued bodily ailments, and after the death of her brothers, a condition of mind bordering on insanity, continuing to the time of the execution of the deed and lease. The business of executing the deed and lease was hurried through by the defendant, after her consent to make them was obtained, without the knowledge of any of her friends, even the sister who occupied an adjoining room being kept in ignorance of the transaction, and instead of the attorneys who had always been employed by her brothers to transact their legal business, and whom on a former occasion, she had employed in her own business, the defendant had the papers prepared by a very competent lawyer, but a stranger to the plaintiff, and one whom defendant himself had never employed before, and whose office was in the same building with that of Messrs. Cline, Jamison & Day, the attorneys of plaintiff's brothers while they lived. It is evident from the testimony of Mr. Babcock, who prepared the conveyance, that he thought there was something

wrong in the transaction. He does not say so expressly, but he took unusual precautions to inform Miss McClure of the contents of the deed by reading it to her slowly and distinctly, when he well knew it was no part of his duty to do so, if it was her voluntary act, and she was in a condition to perform it. It was not at all incumbent upon him to explain, or even read it to her, unless she requested it. She was taken from a sick bed, as she and her sister both testify, at an inclement season of the year, a distance of ten or twelve miles, to execute the conveyance. Mr. Babcock testifies that the defendant had previously come to his office and requested him to prepare the papers, stating that the plaintiff was then able to attend to the business, but that he did not know how long she would be able to do so; was in a hurry to close up the business, and said plaintiff was also anxious on the subject. Mr. Lewis, in his testimony, contradicts Mr. Babcock, but he has a very considerable interest in the controversy, while Mr. Babcock has none whatever.

While there was no technical relation of trust between the parties, a relation of intimacy and kindred was established between the plaintiff and Lewis and his wife, which enabled the latter, if so disposed, to influence the plaintiff, who lived in their house as one of the family, and was greatly dependent upon them for society and comfort, and attached to Mrs. Lewis more than to any other of her relatives. Lewis and his wife were very kind to plaintiff, and however sincere and disinterested their kindness, it was calculated to and did give them an influence over her possessed by no one else. Mrs. Lewis says in her testimony that she first made the proposition to convey to him the property. She says on the contrary, that one evening, after the lamp was lit in her room, her niece, Mary Emily Lewis, wife of defendant, came in, put her hand on plaintiff's head, and, kissing her, said: "Aunt, I am very grateful for what I hear you are going to do for me." I said "what Mary?" She said "I hear you are

going to give me your property." I said, "why?" She said "she heard it." Mr. Lewis testifies that the first he ever knew of Miss McClure wanting to make any disposition of the property, was through his wife. Miss McClure is not contradicted but rather corroborated on this point by this testimony. If any one had informed Mrs. Lewis that her aunt intended to convey the property to her, that person's testimony on the subject would have been important, and in the absence of such evidence, it is a reasonable inference that the subject was not mentioned or talked of by Miss McClure to or with any one except Lewis and his wife. Here, then, an old lady, fifty-two years of age, a confirmed invalid, broken down with disease in body and mind, gloomy and hysterical, is induced by a young man in the enjoyment of health, his mental faculties unimpaired, to convey to him, in hot haste, a tract of land and a valuable city lot, all she possessed, for a sum of money not exceeding one-eighth of its value, without any suggestion that she should take counsel of others on the subject, or even giving her time and opportunity to do so, if she desired—keeping the matter a secret from her elder sister, with whom she was on intimate and affectionate terms, and from the executor of the will under which she derived a large amount of the property, and withholding the conveyance from record until November, 1875, after an estrangement had arisen between the parties. These facts lead us to a conclusion different from that reached by the circuit court and the court of appeals.

In *Gibson v. Jeyes*, 6 Ves. 278, Lord Chancellor Eldon observed: "That he who bargains in matter of advantage with a person placing confidence in him, is bound to show that a reasonable use has been made of that confidence; a rule applying to trustees, attorneys or any one else." In *Evans v. Llewellin*, 1 Cox's Chan. Cases 333, three brothers owned a tract of land, but were ignorant of their rights. The defendant was in possession, and, desiring to sell, was told that he had no title, but that Thomas, the eldest of

the three brothers, owned it. The defendant was in good circumstances and position, and he procured an interview with Thomas, who was then informed by one Maddock, a solicitor, that he was the owner of the land, and that it was of the value of £1,700, and defendant offered him £200 for his deed of release, which was accepted, and the release executed. Subsequently the defendant ascertained that, instead of owning the entire property, Thomas was seized of only one-third, and that each of his two brothers owned one-third. He then told Thomas that he ought to return £100, and that he would give it to his brother Joseph for a release of his interest. Thomas then signed an agreement to return £100, and Joseph executed a release to the defendant. Here no facts were concealed. Mr. Maddock informed Thomas of his rights—of the value of the land. So far as appears from the report of the case, Thomas and Joseph were mentally and physically capable of attending to their own business. Lord Kenyon said : " It has been truly argued that no facts were in this case kept back from the party, no false recitals in the deeds, but that all the instruments contain a full discovery of the facts upon which the plaintiff was to make the bargain. Notwithstanding, I am of opinion that this agreement ought not to stand ; I lay great stress upon the situation of the parties." Again the Lord Chancellor said : " It is said he was cautioned. It is true, and so far the parties did right ; but they ought to have gone further ; they should not have permitted the man to have made the bargain without going to consult his friends. There was no sufficient *locus penitentiae;* there was no person present to give him advice. He was entirely in their hands, and was surprised at this unexpected acquisition of fortune." There was no relation of trust in that case ; no relation of intimacy or kindred ; no dependence whatever, of the plaintiff upon the defendant.

In another case, *Huguenin v. Baseley,* 14 Ves. 273, a widow, for an inadequate sum, conveyed to one who had

ingratiated himself with her and had become her agent and adviser, a valuable property. The Lord Chancellor, Eldon, remarked : "The question is not whether she knew what she was doing, had done, or proposed to do, but how the intention was produced, whether all that care and prudence was placed around her as against those who advised her, which, from their situation and relation with respect to her, they were bound to exert in her behalf."

In *Cadwallader v. West*, 48 Mo. 491, this court said: "Dr. West won Cadwallader's confidence completely, and it is no reproach to him that he did so. Nor is it any reproach to him that he was kind and ingratiating in the discharge of the duties of his trust. Nevertheless, when he came to make bargains with his *quasi* ward, a feeble old man in his dotage, he placed himself in a position of great delicacy, and one that required of him the exercise of the highest sentiments of justice and honor." In *Yosti v. Laughran*, 49 Mo. 598, stress is laid upon the fact that the conveyance, which plaintiffs were seeking to set aside, was concealed from the other children of the grantor.

In the relations of principal and agent, client and attorney, guardian and ward, etc., equity implies a confidence, and in all contracts between them, to which the confidence extends, requires of the party in whom the trust is reposed, the highest degree of good faith. The burthen rests upon him to prove that the contract was not procured by means of such confidence. "But this rule is not confined to the confidence incident to the formal relations alluded to ; it is applicable to all cases where confidence on the one hand, and influence on the other, exists, from whatever cause they may spring." *McCormick v. Malin*, 5 Blackford 523.

Miss McClure's brothers were dead. Her brothers-in-law were either dead or absent in other states. There was no one to whom she could more properly or was more likely to apply for advice in the management and disposition of her property, than Lewis and his wife, and whether

they or she proposed the disposition of her property which was made, it was their duty to give her the best counsel they could, which would have been to consult her sister or the attorneys in whom she knew her dead brothers had confided. If not, he should have told her the value of the estate, and after securing to himself a remainder in fee in her property, in procuring a lease of the premises for her life, should have told her what was the fair rental value of the property. He fixed it at $400 per annum, while the evidence shows it to have been worth about double that amount, and yet, without a word, she accepted his proposition, conveyed to him all her estate, without even stipulating that she should have a home with Lewis and wife for her life, thus stripping herself of property, which would have yielded her ample support while she lived, for a pittance, which would barely enable her to live, if in good health, and in her condition of health, wholly inadequate for her support.

The fact that she encouraged the building by Lewis of the house on the city lot, some time after the deed was made, is relied upon as a circumstance unfavorable to her case. We do not so regard it. The influence which procured the deed continued to that time, and that Lewis chose to humor her in that regard, does not give validity to the prior transaction.

The circuit court dismissed plaintiff's bill, and its judgment was, by the court of appeals, affirmed. We think that the judgment should have been for the plaintiff, and, therefore, reverse it and remand the cause, with directions to the circuit court to cancel the conveyance and lease, ascertain what amount of money is due plaintiff, under the lease, for rent, with interest at the rate of six per cent per annum from the date at which the several annual reservations became due, also the amount of the consideration for the deed from plaintiff to defendant, received by plaintiff, with six per cent interest from the date of its receipt by plaintiff, the balance, if any, in favor of defendant, to be a

lien on all the property embraced in said deed. The court will also ascertain what amount of money was expended by defendant in improvements on the lot in the city of St. Louis, which, less the amount of balance, if any, found for plaintiff on the other account, shall be a lien on the said lot and improvements, which shall be first sold, and if the amount realized on said sale be sufficient to pay the entire balance of money due from plaintiff to defendant, the other property shall be discharged of the lien declared against it; and if more be realized on said sale than is necessary to pay the entire balance due defendant, the surplus to be paid to plaintiff. If said lot sell for less than may be required to pay the amount due the defendant on account of said improvements, the costs of this suit shall be deducted therefrom, and the balance paid to defendant in full satisfaction of his claim for improvements, and the balance due defendant, if any, on the other account, shall be enforced against the other property conveyed by said deed. Execution to issue against the city lot for the aggregate balance found in favor of defendant, if not paid within sixty days from the date of the final decree, and against the other property, ten days after the sale of the city lot, if necessary under the provisions of the decree, unless the amount for which it may be then liable be paid within ten days after the sale of the lot. All concur.

## On Motion for Rehearing.

HENRY, J.—The first proposition of counsel in their brief on motion for rehearing, is that: " The doctrine of implied confidence and implied influence, applicable to the dealings of those sustaining toward each other technical relations of trust and confidence, has none to dealings between those sustaining toward each other the relations merely of intimacy and kindred." This court did not declare that confidence or influence would be implied " from mere relations of intimacy and kindred," but the relations

between the parties, in connection with the other facts proved, was considered in determining whether, in fact, influence existed and was unduly exercised. The cases cited for the doctrine applied to this case, fully sustained it, and we are not inclined to go over the same ground again.

The mistake of fact made by the court was by no means a controlling fact, but was only mentioned in connection with other facts, of themselves sufficient to sustain the conclusion reached. While the withholding the deed from record for several years after its execution, would have been a circumstance strengthening the plaintiff's case, the fact that it was recorded promptly does not counterbalance the facts establishing the exercise of undue influence in procuring its execution.

As to the other alleged misapprehensions of the testimony, we adhere to the conclusions announced in the opinion, viz: That " plaintiff was taken from a sick bed to St. Louis to execute the deed ; that her mind was impaired by long continued ill health, and that in the interval between the death of her brother Francis and the execution of the deed, she was a great part of the time bedridden." In answer to a question, she stated in her testimony that after she was taken down with sickness in December, she first got out of the house when she went to execute the deed. In this she is corroborated by her sister, and yet counsel, whether respectfully or not we will leave for their determination, state that "this finding has its foundation in the brief of the appellant, and nowhere else." The other deductions drawn from the testimony were fully warranted, and we shall not again review the evidence.

They also complain that the court expresses no opinion on the question of estoppel. We did not, because there was nothing in the evidence tending to establish an estoppel. The receipt of rents and of the consideration for the conveyance by plaintiff and acquiescence in the erection of the house by defendant on the lot, and other kindred

acts relied upon to estop plaintiff from seeking the relief she asks, occurred while plaintiff was still under defendant's roof and influence. If we are right in our conclusions from the evidence, that undue influence was exerted to procure the deed and lease, there is nothing to show that such influence had ceased to exist when the above mentioned facts transpired. In August, 1875, the defendant and his family went away, leaving plaintiff and her sister in the house. Lewis and plaintiff had disagreed, and soon after the departure of Lewis and his family, plaintiff went to live with her sister, and in November, 1875, within three months after the separation, this suit was instituted. No laches or delay occurred after the separation before plaintiff asserted her rights. The motion is overruled. The decree is modified so as to charge the entire property conveyed by plaintiff's deed with a lien for any balance which may be found in defendant's favor, between the amount due plaintiff for rents and the amount of the consideration received by her of defendant for the conveyance.