FRANK JONES, Executor, et al. v. JOSEPH BELSHE et al.

Division Two, December 19, 1911.

1. **INCAPACITY: Considered in Connection with Undue Influence.** The evidence may not show the grantor's mind was so impaired as will of itself invalidate a fair contract, made under proper circumstances for proper purposes; but it may show such serious impairment by age and disease as to cause him to yield readily to the persuasion of others, and that fact becomes important in determining whether fraud was practiced upon him by means of undue influence.

2. **UNDUE INFLUENCE: Confidential Relation: Unfair Consideration for Contract.** No general rule can be stated defining what is a confidential relation. Some relations are *per se* con-

fidential, such as attorney and client, guardian and ward; others may be so, depending upon the facts. Two persons stand in this relation, when confidence is necessarily imposed by one and the influence which necessarily grows out of that confidence is possessed by the other; and an abuse of that confidence is undue influence. Where an old man, of impaired mental powers, comes into the house of a strong man and woman, who, concealing from his relatives, friends and usual business adviser what they are about to do, obtain from him a deed to a valuable farm, expressing as its only consideration an agreement to keep and maintain him during his natural life, the contract will be carefully scrutinized to see that no improper advantage was taken of him or undue influence was exercised by them, and in determining whether such influence was exercised the unnaturalness and unfairness of the contract will be considered.

3. ———: ———: ———: **Facts of This Case.** The grantor in the deed for 120 acres of land, worth $8000, sought to be set aside, eighty-five years old, his wife and children dead, had made a will, leaving the farm, with other property, to his two grandchildren, who lived with his daughter-in-law in another State, making the cashier of a bank executor without bond, and left the will with him. Feeble with age and chronic disease, his memory impaired, his sight, hearing and other faculties dimmed or blunted, he relied upon the cashier to advise him in his business affairs, and the cashier in fact transacted his important business for him. In March he went to a hotel kept by defendants to board, was sick there, and dependent on them for proper care. His sickness was serious, and this fact, together with his advanced age, indicated that he had not long to live. They were new-comers in the town, were not related to him, but strangers to him until he went to their hotel to board. He owned other property, and his income was fifty dollars a month—sufficient for his few wants. In May they procured a lawyer to call at the hotel on business, who, in their presence alone, obtained from him instructions to draw up a deed, which was done, and while in bed, and without any suggestion that he should consult the cashier or other friends, he signed and delivered the deed conveying to these strangers the farm, giving to them immediate possession, for a naked promise to keep and maintain him during his natural life. The next day he declared he had only conveyed the rents during his lifetime, and did not understand what he had done, and took immediate steps to set aside the deed. Afterwards, when he had again come under the exclusive control and management of defendants, he stated the deed was gladly and voluntarily made, but that statement he repudiated when by *habeas corpus* he was rescued out of their hands. He died in August. *Held*, that the deed should be set aside on the ground of undue influence.

Appeal from Daviess Circuit Court.—*Hon. Francis H. Trimble,* Judge.

AFFIRMED.

*James F. Wood* and *Frank Sheetz* for appellants.

(1) This court will review the finding of facts by the trial court in an equity proceeding. Brown v. Fickle, 135 Mo. 405; Penne v. Schnecko, 100 Mo. 250; McElroy v. Maxwell, 101 Mo. 295; Hamilton v. Armstrong, 120 Mo. 597. (2) The burden of proof is on the plaintiffs to prove their case as alleged in their petition. Brown v. Fickle, 135 Mo. 405. And by a preponderance of the evidence. Brown v. Foster, 112 Mo. 297; Taylor v. Crockett, 123 Mo. 300. (3) A grantor in a deed is presumed to be sane and competent at the time of its execution. A grantor who is mentally capable to understand business affairs at the time he executes a deed and understands the motive and effect of such deed, knows what property he is conveying and to whom it is being conveyed, is competent to make such deed. 6 Ballard, Law of Real Property, sec. 185. In determining whether a person had capacity to make a contract, the test is whether he had sufficient capacity to understand the particular contract when he executed it. Moore v. Gilbert, 175 Fed. 1. If Bernhard had mind and memory enough to comprehend and understand the value of the property, and the condition and situation of those who had claims on his bounty, he had the right to make the deed. Moore v. Moore, 67 Mo. 198. Mere infirmity of mind and body is not sufficient to overcome the legal presumption of mental capacity in a grantor, but the evidence must show that he did not have sufficient understanding to comprehend clearly the nature of the business he was transacting. Woodville v. Woodville, 60 S. E. 140; Mann v. Keene, 86 Fed. 53; Pennington v. Stanton, 125 Mo. 658. The mere fact that the mind

of a person is impaired by age or disease does not render such person incompetent to make valid contracts. The legal test is the capacity to understand the nature and effect of the transaction. If a person understands the nature of the business in which he is engaged and the effect of what he is doing, his acts are valid, and this is true though the mind of such person may be impaired by age or disease. Cutler v. Zollinger, 117 Mo. 101; McKissock v. Groom, 148 Mo. 469; Curtis v. Young, 147 Mo. 587. (4) The defendants were competent witnesses as to conversations between themselves and persons who had testified for the adverse party. Brown v. Foster, 112 Mo. 297.

*J. W. Peery, Ed. E. Aleshire, John A. Showen* and *R. S. Robertson* for respondents.

(1) Fraud will be inferred in a contract made with a person of weak mind, although not amounting to imbecility or unsoundness, when the consideration is grossly inadequate, unless it appear that such weak-minded person had an intelligent comprehension of the disadvantageous nature of the contract to himself and intended the benefit to be obtained under it by the other party, or unless the contract can be reasonably accounted for upon some other hypothesis than that of fraud, imposition or undue influence. Dickson v. Kempinsky, 96 Mo. 252; Martin v. Baker, 135 Mo. 495. (2) The undue influence exercised in the making of a will is not a standard for testing that influence in the making of a contract between the living. In making the contract the mind and will power of one party necessarily come in contact with those of the other, and may thereby be unduly influenced or entirely overcome. Ennis v. Burnham, 159 Mo. 494; McClure v. Lewis, 72 Mo. 314; Obst v. Unnerstall, 184 Mo. 383; Hurley v. Kennally, 206 Mo. 282; Boggess v. Boggess, 127 Mo. 305. (3) No error was committed by the court in excluding the testimony of the defend-

ant, as under the statutes and decisions of this State they are incompetent to testify to any fact in this case, as Bernhard, the other party to the contract, was dead. Weirmueller v. Scullin, 203 Mo. 466. (4) It would be very strange and remarkable, if a man, something over eighty years old, with ample property to provide for himself, should go out and offer his property to whosoever would take it, and to use the homely illustration used by the trial judge. "It would be not dissimilar to a small child going through the streets of a town and offering a twenty-dollar gold piece to whoever would take it." The question in such case would be, not whether the donation was willingly offered, but whether the person to whom it was offered, should, in equity and good conscience, take it. The facts in this case are stronger against the validity of the deed than they were in the case of Hurley v. Kennally, 206 Mo. 282.

FERRISS, J.—Suit to set aside a warranty deed, executed by William Bernhard on the 14th day of May, 1907, to Joseph V. Belshe and Harriet E., his wife, conveying to them a farm of 120 acres in Gentry county, worth upwards of eight thousand dollars, for the recited consideration of one dollar and love and affection. The deed contained the following provisions:

"It being expressly understood and agreed by the parties hereto that the said parties of the second part shall maintain and keep said party of the first part for and during his natural life in a manner suitable to his condition in life. Said parties of the second part to have immediate possession of said premises, and the rents, issues and profits thereof that shall thereafter become due or accrue."

The petition charges fraud and undue influence on the part of the grantees, together with mental incompetency in the grantor.

The uncontroverted facts are that the grantor, William Bernhard, was eighty-five years old, was born in Germany, spent most of his life in this country, and acquired this farm, together with some town property, by his own efforts; a man who in his prime was possessed of an uneducated but intelligent mind and great strength of will. He spoke broken English, and was slightly hard of hearing in his latter days. His wife died about 1902. No children were living. The widow of a deceased son and her two young children are the only relatives shown by the record. For some time prior to May 14, 1907, the date of the deed, Bernhard was in declining health, and on that date was sick in body and weakened in mind. He had lived around at different places, part of the time with a tenant on his farm. Prior to 1905 he lived some time in Dakota, living with his daughter-in-law, and while there sustained a fall which he said affected his head so as to impair his memory. His business affairs were in the hands of Mr. Frank Jones, cashier of a bank in Stanberry, Gentry county, who was his confidential adviser and who was appointed executor without bond in the last will of Bernhard, executed January 12, 1904.

On March 19, 1907, Bernhard went to board at a hotel kept by the defendants Belshe and wife, who had lived in Stanberry about a year and a half. It does not appear whether Bernhard had any acquaintance with defendants before that time. Bernhard became quite ill at defendant's hotel, and they took care of him. He had chronic inflammation of the kidneys and heart trouble. On May 14, 1907, early in the afternoon, while Bernhard was still sick in bed at defendants' hotel, defendant Joseph V. Belshe called at the office of Mr. James F. Wood, an attorney-at-law in Stanberry, and told him that Bernhard wanted to see him at the hotel on business. Mr. Wood called later and talked with Bernhard in the presence of Mr. and

238 Sup.—34

Mrs. Belshe. Wood returned to his office, prepared the deed in question and took it to the hotel, and it was signed by Bernhard while in bed. Belshe paid the one dollar consideration, took the deed and handed it to Wood to be recorded. On May 25th, following, a suit to set aside this deed was filed in the name of Bernhard in the circuit court of Gentry county. On the same day, in the evening, an inquiry into the sanity of Bernhard was had in the probate court, which resulted in the appointment of Frank Jones as his guardian. Bernhard died in August, 1907.

This suit was tried upon an amended petition filed by said Jones, as executor of William Bernhard, deceased, and guardian and curator of the minor grand children of Bernhard. Fifty witnesses testified at the trial, twenty-nine for plaintiff and twenty-one for defendants. We cannot discuss this mass of evidence in detail. It has, however, been carefully, and fully examined and considered. As is usual in such cases, there is contradiction in opinions as to the mental condition of Bernhard, but there is little dispute upon the facts given in evidence.

The testimony for plaintiffs tended to prove various facts and circumstances which would indicate that at the time of the execution of the deed in question Bernhard's mental faculties were greatly weakened and his memory impaired; that he was in his dotage, or suffering, as two or three doctors testified, from senile debility, and that he was unable to fully comprehend the nature of the transaction. Witnesses for plaintiffs, without substantial contradiction, testified to the following events, which relate both to the charge of incompetency and of undue influence.

On May 25, 1907, Bernhard went to the bank, and in the presence of Frank Jones, Mr. Sager and Dr. Dunshee, stated that he proposed to re-shingle the roof of the house on his farm. On suggestion there made that he had no farm, that he had deeded it to

the Belshes, he indignantly denied it.  He said that he had made a lease which provided that they should have the rent from the farm during his life to pay for his board.  He expressed great resentment, calling the Belshes thieves.  He there acquiesced willingly in a suggestion by Sager that he have Frank Jones appointed his guardian, and proposed that they go at once to Albany for that purpose.  Wherefore, Jones, Sager and Bernhard proceeded to Albany on that day.  An inquiry was had that evening in the probate court into Bernhard's mental condition, before a jury, which resulted in the appointment of Jones as his guardian. At this hearing Bernhard stated that he wanted Jones appointed, that his memory was bad, and that he was not competent to attend to his business.  On the way home he requested Jones to find him a boarding place, expressed his determination to never go back to Belshes, and said that he was afraid they would poison him.  Jones, Sager and Dr. Dunshee testify to what occurred at the bank; Jones, Sager and the probate judge as to the proceedings in the probate court, and Jones as to what was said on the way home.  Jones and Bernhard returned to Stanberry on Sunday, May 26, Jones taking his ward to the Wabash hotel, kept by a Mr. Jones and wife, not related to Frank Jones, and arranging for his board there.  On the evening of that Sunday Mrs. Belshe came to the Wabash hotel and talked with Bernhard.  On this point the landlady of the Wabash hotel, Mrs. Sarah J. Jones testified as follows:

"She came and put her hand on his shoulder, and says, 'Grandpa, where have you been?  I have been hunting over town for you.' 'Oh,' he says, 'I have just come down here.'  She says, 'You have been kidnapped.'  He says, 'No mam, I haven't.'  She kept on talking to him.  I asked her if she wouldn't go to the back parlor and talk.  They did go back there, and

were talking, and she insisted he should go home with her that night; and she told him—''

Mr. Wood, interrupting: "Q. Where was it she commenced to talk to him first? A. First, she commenced to talk in the office. . . . She insisted that he should go home with her."

Mr. Wood: "Q. Was this talk in the office? A. No, sir, it was in my private room—that was after I asked them to go back. Q. You were in the private room, were you? A. I was sitting in the adjoining room. She insisted that he should go. She says, 'Now grandpa, you knew you was signing a deed.' He says, 'I did not; I intended for you to have a lease on that farm, and for you to take care of me as long as I lived;' and she said, 'You come home with me and I will convince you,' and then she insisted that they go. She had her arms around his neck and was crying; and I stepped to the door and says, 'He can't go tonight.' That's all I said to the lady. Then she stayed a little while longer, and took her girl with her and went away. Grandpa went back into the office then, and talked with Mr. Jones. Q. What did he say about this matter? A. I can't tell you anything he said much, only when she started. He retired early. He says, 'I guess I will retire.' I told the night boy to take him up to his room, and he started; and I says, 'Good night, Mr. Bernhard; have a good sleep tonight.' He says, 'Yes, I won't have so much love, but I can sleep to-night. I can have a good night's sleep.' That's the last words I ever heard Mr. Bernhard say. Q. You say you didn't see him any more? A. No, sir, he was gone when I sent up for him to come to breakfast.''

Bernhard returned to the hotel of the Belshes on Monday morning, and remained there until June 21st following. He was visited there by Frank Jones, who found him in bed, sick. Bernhard then expressed great anger toward Jones, accusing him of wanting to

put him in an asylum, and refused to go with him, saying he wanted to stay where he was. One or both of the Belshes were present during the visit. Later, Jones instituted *habeas corpus* proceedings against the Belshes, and Bernhard was taken away, against his protest. With regard to this incident the sheriff testified as follows:

"I think, when I stepped in the room where he was, Mrs. Belshe was in the room where he was. Q. Well, do you remember what she said and what she did? A. Well, I told the old gentleman what I was there for, and he says, 'I don't know you;' and I believe that she spoke up and told him 'that's the sheriff.' He says, 'The sheriff?' he said, 'I haven't got any business with the sheriff;' says, 'I haven't done anything.' I says, 'No grandpa, you haven't.' I says, 'I have got to move you.' 'Move me?' he says, 'You are going to take me to St. Joe.' He says, 'I am not going.' I says, 'I am not going to take you to St. Joe.' He says, 'I know you are.' So I insisted on his going, but he wouldn't consent to go."

By the Court: "Did he say how he knew you were going to take him to St. Joe? A. No, he didn't tell me how he knew I was going to take him. I told him I was going to take him out to Mr. Temple's, but he didn't seem to believe me at all. I insisted on his going, but he wouldn't consent, as I told you, and he finally agreed, if they were willing, he would go."

By the Court: "If who were willing? A. If Mr. and Mrs. Belshe were willing. I went to Mrs. Belshe and told her, 'I am going to take him; I have got to take him. Of course I don't want to hurt him or be rough with him, and I'd rather get his consent than to take him against his will; and if you can say anything to induce him to give his consent to go it will be better all around—better for him and better for me.' She says, 'I won't do it;' she says, 'If you take him, you'll just have to take him, that's all.' 'Well,' I

says, 'I will have to take him.' I went from her to
Mr. Belshe, and asked him the same thing. He says,
'No, if you take him you'll take him—I am not going
to tell him to go or not to go.' I says 'All right.'
So I think myself and Mrs. Temple went to Dr. Mc-
Caslin to make inquiries as to whether he thought he
was able to stand the trip or not—I didn't know how
bad he was—he was in bed, and I wanted Dr. McCas-
lin's advice, and I asked him; and he says he thought
he could stand the trip all right; and I says, 'Well,
this evening I am going to take him.' So I left Mrs.
Temple at the doctor's, and went down town to get
help to take him. When I got back to the hotel Dr.
McCaslin and Mrs. Temple were there, so I went in
and told him that I had come to take him away; and
he says, 'I no go.' So we taken hold of him, put his
feet on the floor, put his socks on and put his pants
on—put his clothes on—and after he seen we was
going to take him he didn't fight against it quite so
hard—helped to get his clothes on.''

By the COURT: ''He didn't fight quite so hard?
A. No, sir; when he seen we was going to take him—
of course, I didn't know where his clothes were, his
coat and pants and shoes,—and I asked Mrs. Belshe
where they were. She didn't tell me; and I asked her
about his medicine, and she wouldn't give me any sat-
isfaction about that. She said it was on the stand.
I said I didn't want to get something he wasn't taking.
She says, 'You can get whatever you want to—I will
not have a thing to do with it.' So I got what medicine
was on there she said belonged to him.''

The sheriff took Bernhard out to the house of Mr.
George Temple. On arriving there Bernhard ex-
pressed distrust and dislike for Jones; but his atti-
tude changed that evening. His daughter-in-law and
two grandchildren were at the Temples' when he ar-
rived. He expressed pleasure at seeing them, caressed
the children, and said, ''We are a happy family again;

now we will live together.'' He said the Belshes were French gypsies, and that she was a gypsy witch and could do anything with him that she wanted to. He seemed very happy. Frank Jones came to see him on the second day. Bernhard was cordial to him, and spoke of him as having always been his best friend. After a few days, Bernhard went to live with his daughter-in-law, and remained there until his death, in August, 1907.

Evidence for the plaintiffs tended to show, further, that Mrs. Belshe refused to allow Mrs. Minne Bernhard, the daughter-in-law, to have a private conversation with Bernhard.

Several persons, including two doctors, visited Bernhard about the last of May, and testified for the defendants that, in their opinion, although his mind appeared to be somewhat weak to them by the natural effect of age, it was still sound. Other witnesses who knew him and saw him prior to May 14, the day of the execution of the deed, gave similar testimony. Most of the defendants' witnesses gave merely negative testimony; that is, that so far as they saw or noticed, his mind was right. They gave few incidents of fact. Two of them in particular narrated remarks by Bernhard which tended to support the theory of plaintiffs, although the same witnesses gave opinions that he was sound mentally.

The main witnesses for the plaintiffs were persons who had been intimately associated with Bernhard. These were Mr. Jones, his business adviser; the Temples, with whom he had lived, and his regular physician. They related numerous incidents on which they based their opinions that he was incompetent to understand or transact business. The opinion witnesses for the defendants, and many for the plaintiffs, were mere casual visitors. Two physicians who were called in by Belshe on May 28, after the guardian was appointed, and the day after Bernhard left the Wa-

bash hotel and returned to the Belshes, testified at the trial. One testified that Mr. Belshe was there; that Bernhard complained of the attempt of Jones to take him away; that he said he liked the place and the people; that he had worked for what he got, and ought to do with it as he pleased; that if he was as young as he once was they couldn't take him. The other doctor testified that Bernhard said that he had deeded his farm to the Belshes to take care of him; that if he lived two years they would have a bad job, but that if he died in six months or a year they would make money.

Other witnesses who visited Bernhard after May 28, testified, in substance, that Bernhard said he had deeded his farm, and was satisfied.

Mr. James F. Wood, the attorney who prepared the deed, testified as to the circumstances surrounding the making of the deed in question. In substance, his evidence was that Mr. Belshe called at his office early in the afternoon of May 14th, and stated that Bernhard wanted to see him at the hotel about some business; that he went there, between three and four o'clock, and listened to a long, rambling, desultory talk about various disconnected matters, by Bernhard, who finally said that he wanted witness to tell him how to convey his farm to the Belshes in consideration that they would keep him the rest of his life, and whether it should be by will or deed; that Bernhard said he had made a will, with Frank Jones as executor, and that the will was at the bank. Witness advised a deed, and, Bernhard approving, witness went to his office, wrote the deed, returned with it to the hotel, and read it all over to Bernhard once, and the clause providing for his maintenance a second time; Bernhard approved it, signed it in bed, acknowledged it before witness as notary, and delivered it to Belshe, who paid the one dollar money consideration. Belshe

then handed the deed to witness to be sent to the recorder's office. Both of the defendants were present during all the time witness talked to Bernhard and when the deed was signed. No one else was present. Bernhard also talked to witness about his other property, which was to go, he said, to his grandchildren. In the opinion of witness, Bernhard was capable of understanding the transaction. After the guardian was appointed, witness advised Belshe to call in some doctors, and let others in to see Bernhard, if they came "in a fair and reasonable spirit, and not in the role of meddlers or trouble-makers." All this advice was "inasmuch as we didn't know what proceedings would take place." On cross-examination, witness stated that Bernhard said, when the instructions were given for the deed, that he wanted to turn over the possession and rents immediately. Witness advised Mrs. Belshe to go to the Wabash hotel on the day Bernhard was placed there by his guardian, "and give Mr. Bernhard assurance that she was ready and Mr. Belshe was ready to perform their part of the contract, and that the house was open to him, and he would be received back if he wanted to come back." Q. "Tell the court why you didn't send Mr. Belshe instead of Mrs. Belshe?" A. "I said I advised Mrs. Belshe; I want to modify that by saying I suggested to them, as parties to this contract, that it would be incumbent upon them to signify willingness to perform their part of the contract." At this time Wood had heard by telephone from Albany of the appointment of the guardian, but had not seen the papers. Witness advised the Belshes concerning the *habeas corpus* proceedings, and represented them at the trial of this case, and represents them here.

Counsel for defendants has briefed this case on the theory that it involves the question only of mental capacity. All his citations are upon this point.

The petition is grounded on undue influence, and counts but lightly on incapacity. The main allegation is this:

"Plaintiffs further state that the said defendants, by acts and blandishments and assiduous attentions to said William Bernhard during an attack of illness, and while he was boarding with them as aforesaid, obtained an undue influence over the mind of said William Bernhard, and fraudulently and falsely induced and persuaded said William Bernhard to believe that he was in great danger of coming to want, and that they, the said defendants, were his best and only friends, and he, the said William Bernhard, being old and feeble and weak of mind as aforesaid, and unable by reason thereof to resist the entreaties and undue influence of the defendants, and being by them prevented from consulting with those who had for years advised him in business matters, was induced by said defendants, secretly and without opportunity to consult or advise with his friends, and those who had for years managed his business affairs, to execute the instrument aforesaid, without being capable or competent to understand the nature and character thereof; that said defendants, by reason of the weak and feeble condition of the said Bernhard, and by their arts and attentions to him, acquired an absolute control and undue influence over him, with the purpose and intent of fraudulently obtaining from him the land aforesaid without consideration, and the execution of said instrument was caused and procured by said defendants, as a direct result of said undue influence, and of said want of mental capacity on the part of said Bernhard to either resist the influence of the defendants or to understand or appreciate the character and nature of said instrument."

These allegations are denied in the answer.

Appellants rest their case upon the proposition that if a person has enough capacity to understand the

nature of the business in which he is engaged, and the effect of what he is doing, his acts are valid, even if his mind is impaired by age or disease. Conceding this proposition and conceding further, for the present, that under the evidence Bernhard had capacity, measured by this test, the case is by no means settled in favor of appellants. The important question is, was fraud practiced on Bernhard by means of undue influence? In considering this question the fact that Bernhard's mind was weakened by age and disease becomes important.

We have these two propositions to consider in this case:

(a) Was Bernhard wanting in sufficient intelligence to make a binding contract? The evidence does not show him to have been either insane or an imbecile. It does show, upon the testimony of the witnesses on both sides, that his mind was seriously impaired by age and disease—so much so as to cause him to yield readily to the persuasion of others. We do not say that his mental condition was such that would in itself invalidate a fair contract, made under proper circumstances for proper purposes.

(b) Was this deed procured by fraud? On this point the field of investigation is broad. We should consider the relationship of the parties, the character of the transaction, the mental condition of the grantor, and the adequacy of the consideration. What is a confidential relation? This question cannot be answered by any general rule. Some relations are *per se* confidential, as attorney and client, guardian and ward. Others may or may not be so, depending upon circumstances. " 'The only question is, Does such relation in fact exist?' While the relation of nurse and patient may raise the question, yet it does not in itself answer that question, but the inquiry is still one of fact." [Studybaker v. Cofield, 159 Mo. l. c. 613.]

This idea is more fully elaborated in Martin v. Baker, 135 Mo. l. c. 503, where we approve the following statement of the law in this regard: "Wherever two persons stand in such a relation as that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of the position will not be permitted to retain the advantage, although the transaction could not have been impeached if no confidential relation existed."

In the same case we say further: "Another well recognized principle may be stated in this connection, which is, that one may be capable of making a will, and yet incapable of making a contract. In making the latter his mind and will power necessarily come in contact with that of the other contracting party, and may be unduly influenced or entirely overcome by it. A contract, therefore, by one of impaired mental and will power with one standing in confidential relations with him should be closely scrutinized to see that no improper advantage has been taken or undue influence exerted. The exertion of undue influence in such case may be pronounced from the nature of the contract, and from an unfair and unreasonable advantage secured by it."

In McClure v. Lewis, 72 Mo. 314, we said this in a case where a woman deeded her property to a niece with whom she was living, in consideration of love and affection, reserving a life estate: "While there is no technical relation of trust between the parties, a relation of intimacy and kindred was established between the plaintiff (grantor) and Lewis and his wife (grantees), which enabled the latter, if so disposed, to influence the plaintiff, who lived in their house as one

of the family, and was greatly dependent upon them for society and comfort."

We also in that case quoted with approval the following from a decision by Lord ELDON: "He who bargains in matter of advantage with a person placing confidence in him, is bound to show that a reasonable use has been made of that confidence; a rule applying to trustees, attorneys, or *any one else.*"

And this (in the same case) from Lord KENYON: "It is said he was cautioned. It is true, and so far the parties did right; but they ought to have gone further; they should not have permitted the man to have made the bargain without going to consult his friends. There was not sufficient *locus penitentiae;* there was no persons present to give him advice. He was entirely in their hands."

Ennis v. Burnham, 159 Mo. 494, ruled that a deed to land worth between six and eight thousand dollars, for the support of the grantor, aged seventy-eight, and his wife, was grossly inadequate as to consideration, and the bargain was "hard and inconceivable," although made to a daughter and her husband. The court, commenting on the evidence, says: "That the inadequacy of the consideration and the unfairness of the bargain must have been palpable to the healthy, discerning eyes of the grantees cannot be doubted. That the grantor did not comprehend and did not intend to execute a deed of the purport of this one, is fairly inferable from the evidence. That he was in a condition to be easily influenced, and the grantees in a position to exercise such influence, is also beyond question, and that the deed was the product of such influence exercised by them, is the only rational explanation of all the facts and circumstances of the case. In view of the character of the contract and the relation of confidence and trust sustained by the grantees to the grantors therein, the influence which produced this deed must be held to be undue and illegal."

The case of Martin v. Baker, supra, is clearly in point both upon the facts and conclusions thereon.

The cases cited by appellants are in harmony with those referred to above, and do not help appellants upon the questions involved here. We will refer to some of them:

Pennington v. Stanton, 125 Mo. 658, involved no question of undue influence. The deed was set aside in the trial court solely on the ground of mental incapacity. The facts in that case were that the grantor, a woman, seventy-two years old and an invalid, deeded her farm of ninety acres—value not given—in March, 1889, to the defendants, who had taken care of her since March, 1887, and who continued this care until her death, in 1892. The suit to set aside the deed was brought after her death. Aside from this farm, the grantor in the deed owned a few head of stock and four or five hundred dollars in money. The proof showed that the support and care given by the defendants was adequate consideration for the deed. The proof further showed clearly that she knew the contents of the deed, and there was no evidence of undue influence. Five witnesses gave testimony of doubtful weight tending to show incapacity, while thirteen witnesses testified that she was of sound mind and capable of managing her property. This court held that the evidence was strongly in favor of the defendants, and for this reason reversed the case.

The case of Cutler v. Zollinger, 117 Mo. 92, involved only a question of mental capacity. Upon this point the court affirms the familiar doctrine that "the real question in this case is one of fact, and that is whether the plaintiff had sufficient reason to know and understand what she was doing in making the sale." The trial court found that the grantor had sufficient capacity, measured by this rule. The sale was an ordinary transaction, for full value, made through real estate agents, after consultation with and approval

by the grantor, nothing appearing in her manner to indicate any lack of mental capacity on her part. The judgment was affirmed.

In McKissock v. Groom, 148 Mo. 459, the court found as a fact that there was neither undue influence nor mental incompetency. This case is important in that it points out the distinction between undue influence exerted by a child upon a parent through the mere love of the parent and that exerted by a stranger; that is to say, the difference between yielding through love and yielding through mental weakness.

Cutts v. Young, 147 Mo. 587, involved this state of facts. The grantors, Cutts and his wife, were old and feeble. They had an imbecile son. Cutts determined voluntarily to deed this land to the defendant in consideration of support for himself, wife and son during their lives. He made the proposition to defendant, who accepted it. A deed was executed by Cutts and wife providing for such support. Both Mr. and Mrs. Cutts died a few days thereafter. Suit was brought by the feeble-minded son and other children to set aside the deed. The court used the following language in its opinion sustaining the deed: "Knowing the infirm condition of himself and wife, and that they could not live much longer, his purpose in making the deed seems to have been to provide a means of support for them, and their son George, in their helpless condition, during their natural lives, as he said, so that they would not have to work. Whether the mode selected was a wise one or not is not for our consideration, but certain it is, it was of the grantor's own suggestion and volition. There is nothing in the record which we think shows that William Cutts was incapable of making the deed in question, or that it was obtained by fraud or undue influence on the part of the defendant. We are supported in the conclusion reached by the finding of the court below, to whose

judgment we must to some extent defer. We there-
fore affirm the judgment.''

The case just cited goes no further than to sus-
tain the proposition that Bernhard had the legal right
and power to make the deed in question, if it was upon
his own volition and with full knowledge of its import.

Studybaker v. Cofield, supra, involved only ques-
tions of fact. It was held in that case that there was
not sufficient proof of either incompetency or undue
influence to invalidate the deed. Upon the point of
the relation of nurse and patient, with opportunity for
undue influence, what is said in that case does not help
plaintiffs in the case at bar.

Guided by the foregoing principles, let us review
the situation here: Bernhard, eighty-five years of age,
had made a will, leaving his farm, with other property,
to his two grandchildren, who were the natural ob-
jects of his bounty. He made Frank Jones, cashier
of the bank, executor without bond, and left the will
with him. Bernhard was feeble with age and chronic
disease, his memory impaired, and his sight, hearing
and other faculties blunted. He relied upon Jones to
advise him in his business affairs, and Jones in fact
transacted his important business for him. His farm
was occupied by a tenant. He had no home. He goes
to board at a hotel kept by defendants, in March. Is
sick there, and dependent on them for proper care.
His sickness is serious. This fact, together with his
advanced age, indicated that he had not long to live.
The Belshes were comparatively new-comers in the
town, were not related to Bernhard, but, so far as this
record shows, strangers to him until he went to their
hotel in March. He had an income from his property
of fifty dollars a month—sufficient, it would seem, for
his few wants. He owned a farm worth from seven
to eight thousand dollars, besides other property in
town. On May 14th Belshe procured a lawyer to call
at the hotel to see Bernhard on business. So far as

we know, this lawyer had never done any legal business for Bernhard. The lawyer calls at the hotel, talks with Bernhard *in the presence of the defendants and with no one else present.* Mr. Wood, the attorney in question, does not claim to have advised Bernhard; he sought only to get instructions. Bernhard had no one to advise him, unless peradventure the Belshes were good enough to add this to their other kind offices. There was no suggestion made that he should consult his friends, nor was time or opportunity given him to do so. The deed was at once prepared, read over to him, signed in bed, and delivered, conveying absolutely, with right of immediate possession, a farm worth upwards of eight thousand dollars in consideration of a *naked promise* by comparative strangers, who are not shown to have had any financial responsibility, to care for him until his death, an event obviously near at hand. The entire proceedings, from the beginning of the talk with the lawyer to the delivery of the deed, transpired between a time fixed by Mr. Wood as between three and four o'clock in the afternoon and supper time. That the situation of the parties required that friends of Bernhard should be consulted before the deed was signed was conceded by Mr. Wood on the witness stand. He was asked whether he had not stated that if it had been in his power he would have advised Bernhard not to sign the deed. In response he said:

"I don't think I did. I couldn't say; I might have made some suggestion as to whether or not it might have been best to have suggested the coming of some friends of the other parties at the time of the making of the deed, so as to have shown that Bernhard was in a proper condition. Q. In other words, you may in this interview with your brother-in-law have expressed some misgivings as to whether a little more time should have been taken in the matter? A. Not

in the sense that I think you mean to have it implied. Now if you will permit, Mr. Perry, as I understand it, transactions of this kind are closely scrutinized by all parties, and should be closely scrutinized, and the conduct of persons who take property by gift, or from an old person, should be inquired into with care to the utmost fairness to all concerned. Along these lines, I don't think it would have been a bad thing for Mr. Bernhard, nor for the Belshes, nor for those who are prosecuting this suit, to have had more witnesses present at the signing and delivery of this deed.''

If Bernhard had lived to the full limit expressed by him, two years, the consideration would have been grossly inadequate.

The transaction, taken by itself, without further proof, considering the relations of the parties, the mental condition of the grantor and the inadequacy of the consideration, will not bear the scrutiny of the law. The subsequent conduct of Bernhard shows that he did not understand the next day what he had done. He declared that he had only conveyed the rents during his life time, and took immediate steps to set the deed aside. It was not until he came again under the *exclusive control and management* of the defendants, that it was given to him to know that he had gladly and voluntarily deeded away his ownership of the farm.

Taking all the facts in evidence into consideration, we cannot doubt that the judgment below should be affirmed. It is so ordered. *Kennish, P. J.,* and *Brown, J.,* concur.