John L. McCollum and George M. McCollum, Appellants, v. Eva Watts and Otis Watts.—5 S. W. (2d) 420.

Division Two, April 9, 1928.

*Roger Miller* and *Scott J. Miller* for appellant.

*H. R. West* and *Thomas P. Burns* for respondents.

HIGBEE, C.—This is an action to cancel a deed executed by William M. McCollum on August 26, 1919, and filed for record in the office of the Recorder of Deeds of Linn County on May 26, 1920. It was tried in the Circuit Court of Macon County, and judgment was rendered for the defendants on September 29, 1924. The judgment recites that "this is an action instituted in Linn County, Missouri, and brought to this court on a change of venue from said Linn County Circuit Court. The court finds the issue for the defendants

and that plaintiff ought not to recover herein." Judgment was rendered accordingly and on the same day plaintiff, William M. McCollum, was granted an appeal to this court. The plaintiff died in October, 1925, survived by his two sons, John L. and George M. McCollum, and his daughter, Eva Watts, wife of Otis Watts, the defendants. On January 24, 1928, the two sons entered their appearance and the cause was revised in their names as appellants. The abstract of the record does not show the date of the filing of the petition, but it may be assumed that it was filed during the year 1923. It is very long but may be summarized as follows:

Plaintiff, William McCollum, states that on August 26, 1919, he was the owner of 120 acres of land, describing it, in Linn County, Missouri; that on May 26, 1920, a deed purporting to have been executed by him on August 26, 1919, was filed for record in the office of the Recorder of Deeds in said county, for the expressed consideration of $14,040, and that on May 26, 1920, there was also filed for record in said recorder's office a deed of trust purporting to have been executed by the defendants to Walter McCollum as trustee for William McCollum, plaintiff, to secure the payment of a note purporting to have been executed by defendants, dated August 20, 1919, by which they agreed to pay to plaintiff $9600, with interest at three per cent to be compounded annually; that on March 11, 1922, there was also filed for record in said recorder's office a purported contract of that date by and between plaintiff as first party and the defendants as second parties, reciting that whereas said parties have heretofore made a contract by which parties of the second part agreed to board and care for first party during his natural life, in consideration whereof first party agreed to release and cancel the aforesaid note and deed of trust for $9600, or to bequeath the same to the second parties by his last will: Now, to make the matter definite and certain, first party agrees to assign said note and deed of trust to second parties and that the same may be cancelled of record and second parties agree to provide a suitable home and care for and administer to the wants of the first party, and pay first party $75 on June 1, 1922, and $75 on January 1, 1923, and like sums semi-annually thereafter during the life of first party, and to provide and furnish medicine and doctors, if necessary, and a suitable burial on the death of first party, and that the obligation of said contract shall be a special lien on the said 120 acres of land (describing it), which contract was duly executed, acknowledged and certified and filed for record on March 13, 1922, and said deed of trust was released and said note cancelled on the margin of the record of said deed of trust.

It was further averred that plaintiff's wife died on January 17, 1916; that plaintiff was seventy-six years of age at the time of her

death; that her sudden death and his advanced age caused a mental decay and a breaking down of his health in general, and he was unable to understand sufficiently to transact the ordinary affairs of life in business transactions; that Eva Watts is plaintiff's daughter and Otis Watts is her husband; that after his wife's death plaintiff lived with one of his other children until the spring of 1917, when a feeling of extreme loneliness induced him to return to the old homestead where he took the defendants to keep house and care for him; that they at once began by all the arts, wiles and scheming designs to defraud him of all of his property; they threatened that unless he deeded them all his land they would go away to a distant state and leave him and never let him see them again; that he withstood these importunities until August 26, 1919; that shortly before that date and while he was affected with old age, arteriosclerosis and ill-health, they persuaded him against his will to sell them the farm described in the petition for the sum of $14,040, upon the promise of payment to him of $4440, and they executed to him a deed of trust for the sum of $9600, due in five years, with six per cent interest; that but for the record showing his signature he does not know that he executed a deed for his farm or had received a deed of trust for $9600, due in five years; that said deed of trust only drew three per cent per annum, not six per cent, as he was told would be the rate of interest thereon; that he was at the time completely within the control of defendants; that they placed said deed and deed of trust on record and failed to pay him the difference in cash, or $4440, or any other sum, and he did not know that he had executed the deed or deed of trust or had not received the payment as stated; that they lived on the farm from the spring of 1917 until the execution of said deed and used said farm and the emoluments thereof for their own use and converted to their own use all of plaintiff's personal property on said farm, and on March 11, 1922, while plaintiff's mental and physical condition had grown worse and they had gained complete control over the mind of plaintiff, in order to cheat and defraud plaintiff of all the property he then owned and without any consideration, they induced plaintiff to execute the unconscionable contract of March 11, 1922, aforesaid, and without his knowledge or consent secured the said note for $9600, and so obtained title to said farm without any consideration while he was so mentally incapable to transact business; wherefore he prays that said deed made on August 26, 1919, and the said contract be set aside, etc.

The amended answer admits that plaintiff, on August 19, 1919, was the owner of the 120 acres of land, the execution of the deed of trust and contract mentioned in the petition and the satisfaction of the record of the deed of trust, but denies all other allegations in

the petition. It avers that the written contract of March 11, 1922, was made pursuant to a parol contract between said parties made long prior thereto and partially performed at the date of said written contract; that defendants have performed and offered to perform said contract; that they boarded and cared for plaintiff from the date of said contract until January 3, 1923, when plaintiff left their home, and that, acting under the influence of plaintiff's two sons, John L. and George M. McCollum, plaintiff has refused and still refuses to return to them and he instituted and prosecutes this action under the influence of his said sons; that relying on said deed and contract they have made valuable and lasting improvements and paid the taxes on said land for the last five years; that they paid plaintiff $500 on the purchase price of said land, and the interest on said $9600 note and mortgage mentioned in the petition for three years; they have paid plaintiff four of the semi-annual payments of $75 provided in said contract; they have boarded and cared for plaintiff for more than three years, and have thus laid out and expended and furnished board and care to the value of $5000; that plaintiff had full knowledge that said expenditures were made by defendants in reliance upon said deed and contract and made no objection thereto, and he is now estopped and precluded by his laches from questioning the validity of said deed and contract. Wherefore defendants pray to be discharged, but if the court should set aside said deed and contract or either of them, they pray judgment for the amount of their expenditures, etc.

The reply is a general denial and avers that in equity and good conscience upon the setting aside of the deed and deed of trust defendants should be entitled to all moneys advanced by them on the purchase price of the land, if any, and under the contract, which is still in the bank, and they should be allowed a reasonable amount for the care and keep of the plaintiff, less the value of the use of the land, and that an accounting should be had between plaintiff and defendants upon these items, etc.

William McCollum was eighty-one years of age at the time of the trial in September, 1924. According to the testimony of George M. McCollum, his father had acquired most of his 120 acres of land at an early date and he and his wife had lived on this land as his homestead. Three children, John L., George M., and Eva were born and reared on the farm. In 1895 the two sons and their father went into partnership in farming and raising stock. George and John then owned about 120 acres of land and were worth less than $2000. Their father had ninety-two acres of land, including twenty-four acres of timber. The partnership continued nineteen years, or until the fall of 1914, when it was dissolved, and the partnership property, 105 head of cattle of all ages, was equally divided between them.

The two sons then owned 400 acres of land, while the father had ninety-six acres and the twenty-four acres of timber. George testified that his father was not competent to transact business at the time of the dissolution of the partnership.

Otis Watts had been employed for several years in a shoe factory in Brookfield, in Linn County. In September, 1914, he and his wife and children went to live with Mr. McCollum on the homestead. Defendants lived with him there until the latter part of December, 1915, when they returned to Brookfield. On January 16, 1916, Mrs. McCollum was burned and died from the effects thereof. In March or April, 1916, the defendants returned to the homestead. On August 26, 1919, McCollum conveyed his 120 acres to them for the expressed consideration of $14,040. The defendant paid McCollum $500 in cash, which was applied in payment of a mortgage on the farm, and executed a note payable to McCollum for $9600, due five years after date, with three per cent interest payable annually, and a deed of trust on the 120 acres to secure the payment of the note. These were filed for record on May 26, 1920. On March 11, 1922, a contract was executed releasing the deed of trust and canceling the note. By this contract, which was also filed for record, defendants bound themselves to care for McCollum during his life and give him a suitable burial at his death, as set forth in the petition. On the information of the two sons an inquiry was instituted in the Probate Court of Linn County under Sections 444 et seq., Revised Statutes 1919, as to McCollum's sanity, and on August 10, 1922, a hearing was had thereon before a jury who, by their verdict, discharged McCollum. The record of this inquiry was not offered in evidence, but references are made to it throughout the evidence. At the trial plaintiff's counsel read a copy of the evidence of William McCollum at said hearing. On January 3, 1923, McCollum left the defendants' home and thereafter until the trial lived with his son George. Up to this point there is substantial agreement as to the facts.

It is the contention of appellants' counsel that the evidence clearly shows that at the time of and ever since the execution of the deed to the defendants, McCollum, from old age and debility, was and has been of unsound mind and incapable of transacting his ordinary business, or of understanding that he was disposing of his property; that the defendants sustained a fiduciary relation to McCollum and by fraud and undue influence induced him voluntarily to dispose of all his property to them, and that in so doing he acted solely upon their suggestions and without the advice of counsel. They offered the testimony of about twenty witnesses, most of whom were McCollum's neighbors and acquaintances.

Thomas Shiflett testified: I have known McCollum and neighbored with him ever since I knowed anybody. I noticed a difference

in him mentally six or seven years ago. He and Ernie Gash, Andy McCollum and I was in Chillicothe one day and he unbuttoned his pants and made water on the street right before some ladies; it was on the public square. I don't see much difference as to his mental condition today only he is feeble. I would say, to the best of my knowledge, a man who would carry on such conduct, he was of unsound mind. In conversations lots of times he cuts conversation short. I don't say he is insane; I say he is feeble-minded. Mr. Watts's two children would ride to school and he would come up the road through the mud a half a mile and get the horse. I can't recall any other facts from which I conclude he was of unsound mind. I didn't see McCollum drink any when we were at Chillicothe. On one occasion Mr. Watts asked me to persuade the old man to give Eva the place. I refused. He also said the old man was feeble-minded, but he wouldn't let Eva have the place. Another time he said McCollum would feed the horses too much, a half a bushel of corn at a time, and he said the old man wanted his place and he told him he could have it back if he would pay for the improvements. He said the old man was getting childish; he would drive the cows up at three o'clock in the evening. He said nothing about the deed, but the deed of trust, he had been after the old man to give Eva the place. That was two years ago last fall. I thought the old man was feeble-minded.

Dr. Jenkins: I have been McCollum's physician the last five or six years. I was in the army two years. I examined him a year ago last April or May (1923). He was of sound mind when his wife died. I noticed a change about two years ago. When I examined him it looked like senile dementia. He would answer questions any way you would ask him. I don't have any idea when I saw him. About two years ago (September, 1922) I examined him in collaboration with Dr. Haley. Senile dementia was very noticeable then. He could be persuaded to do anything. I think he told me he hadn't deeded his place away as I recall it. He was affected with arteriosclerosis; he had high blood pressure: too high for a man of his age. It is progressive. I couldn't estimate about how long he had been affected with this sclerotic condition; probably for years. If a man would urinate on the street and tell the same thing over and over again, I would say he is mentally deficient. I didn't say he was insane. As far as my memory goes I had not had my attention directed to him from the time I entered the army in 1917 until I made that examination.

Dr. Roy Haley: I have been McCollum's physician the last seven months. I examined him in connection with Dr. Jenkins and we talked with him. His blood pressure was 185 systolic and about 95 diastolic. His memory for recent events was not as good as for those

in his earlier life. His arteries were hard and getting old; that would lead to a poor circulation and would not be as active a brain, but as far as any dementia is concerned there wasn't any as far as I could tell; it don't progress very fast. I examined him in May and again in October, 1923. He was about the same as the first time except a little more feeble in getting around. His mental condition hadn't changed so far as I could tell in conversation with him. His mind is the mind of an aged person that is undergoing degenerating changes of old age. He has lost part of his memory and observation powers, ease of expression, mental agility. His mind is normal for his age; the memory was faulty. George McCollum was at the examination. I think he paid me. I think the rule for determining a man's blood pressure is 100 plus his age. His age was seventy-nine and we found the pressure 185; 150 is more like normal, but 185 is not unusual. I didn't notice anything about his mental condition out of the ordinary except he was showing signs of old age; he was forgetful.

Mrs. Weldon: I am a sister of Mrs. George McCollum. I live in Brookfield. I have known Uncle Billy McCollum since I was ten years old. I have seen him several times in the last five or eight years; he has been at my house several times in the last year. I talked to him in June when I was at my sister's. He said Otis had beat him out of his place; he told me about his horses and several things; he told me about a horse he had lost and he cried about it; that it got in Otis's pasture and Otis kept him. I spoke to him several times on the street and he wouldn't speak. I have talked with Eva Watts; she spoke about George and John misusing her as brothers; she said her father was quite feeble and had been quite a charge for her to take care of for quite a while; that he hadn't been able to do any business for the last year or two.

Charles H. Jones: I am a banker and farmer. I have known Uncle Billy McCollum thirty-one years. He did business with the Linn County Bank for several years, but it has been some years since he did the last business with us. Once in a while he would come into the bank after he quit doing business with us. I met him on the street; it might be he did not recognize me because his eyesight is poor. I talked with him on May 2, 1922, at Craig's office. I asked him if he had sold his farm and he said he had to Mr. and Mrs. Watts, one or the other. I think he said to Watts; that he had to take time payment for it. He told me how much it was. I asked if he had the note and deed of trust. He says, Yes, it is up to the Brookfield Trust Company. I was asked to go to Craig's office by one of the two boys; John and George were there part of the time. McCollum told me he had sold his farm to Watts and took back a mortgage for $9600. As I remember, John and George wanted me

to question him a little as to his business. I think I knew at that time the mortgage had been surrendered. I think I learned this first from the records at Linneus. The information he gave me was correct except he said the deed of trust was still at the Trust Company.

There were other lay witnesses whose testimony tended to prove that McCollum was mentally incapable of transacting business when the deed to the defendants and the contract were executed.

About forty witnesses testified for the defendants.

Otis Watts, one of the defendants, testified: I was married to Eva McCollum June 6, 1906. I am forty-five years old. We moved to McCollum's farm in September, 1914. I was employed at that time at the Brown Shoe Company, Brookfield. McCollum had been after me to take charge of his place for about two years. His son John was living with him at that time. He said if I would go out there and work he would give me a half interest in his third of the stock and see that we were taken care of and that we would have this place at his death. George and John and McCollum were farming in partnership; each had a third. He talked with me a number of times. My wife was present when the arrangement was made. Mrs. McCollum participated in the conversations. On one occasion she said they had done a lot for the boys and it was time they was doing something for Eva. McCollum has told me he had deeded to the boys three shares—Blythe's and Mrs. Baker's (his brother and his sister) and his own, in his father's estate, and give them $1100 besides, and helped them otherwise along. We went out there in the fall of 1914 and lived there till about the last of December, 1915. I left because the doctor advised me to leave on account of my wife's health and because of the disagreement between her brothers and myself; just continual nagging at me, mistreatment of myself and wife. Mr. McCollum insisted on us staying there, but he finally agreed for us to leave. Mrs. McCollum died about three weeks after we left. I did not tell Dave Page or Lee Dolt I was waiting to see if I could get the old man to deed me the place. I never said anything to Mr. McCollum about deeding me the place, except when he would speak to me about it. I moved back to Brookfield and worked in the shoe factory. After Mrs. McCollum's death he said if I would go back and take care of him he would fix things so the wife would get the place; that he had done plenty for the boys and he wanted to do for her. He was the first to bring up the subject about our going back after his wife's death. My wife was present when he talked about it at home. Mrs. McCollum died January 17, 1916, and we moved out there in March or April, 1916. I have lived there practically ever since. I moved to town last October to put my children in school. McCollum lived with us on the farm and he came

with us when we moved to town. He was willing. After we had been out there two or three years he offered to sell us the place. He said he wanted enough money to pay off the little indebtedness that had been against the place for years (a mortgage for $500) and he wanted a little interest for spending money and clothes. He said he meant for his daughter to have the place for his care. He often spoke about what he had done for his sons. One reason he gave for wanting to make the deed was that it would stop the boys nagging him to death for the place, continually wanting to buy it. We went to Brookfield at his suggestion to have the papers drawn up. Neither my wife or I ever importuned him to make it over to her or me. We went to Mr. Bresnehan; he wasn't in and we went to the Brookfield Trust Company. Under the contract I was to pay $100 an acre for ninety-six acres and $500 for the twenty-four acres of timber. I think the deed was drawn a few days later. It recites a consideration of $14,040; that was the old gentleman's idea; he said it would look a little larger in case I wanted to borrow money. At the same time we executed a note for $9600 with three per cent interest, due in five years, and a deed of trust. He said he just wanted enough to take care of him and he expected to make his home with me. The deeds were turned over to me and were sent up (to Linneus) and recorded. The note was left with the Trust Company. He said all he wanted was his interest and at his death the mortgage would fall to her; he would fix it by will. He afterwards told me he had made a will and the contents of it; that he had willed John and George five dollars apiece and the daughter the remainder. He said he brought the will out for us to look at and it got misplaced and he couldn't find it; he said he had looked all over the place and John must have got it. John was living there at the time and had been for seven months. He had just left a few days before. Mr. McCollum told about the will having disappeared. Q. In view of the will having been lost what did Mr. McCollum say? A. He wanted to go to town and fix up a paper that could be put on record permanently so it wouldn't get lost. He came to town for that purpose; he didn't make out the contract the first day. I expect I was at fault. I had told George I had offered to deed it back to get away; I was tired of living in the place I was living and I would deed it back to the old man if he would give me what I had put on the place in improving it, and George said that was the thing to do and his wife said to take him up and do it. McCollum wanted to go ahead. I told him I thought he was too nervous. We went home without making out the papers, and a day or two later, at McCollum's suggestion, we came back and went to Mr. Bresnehan's to have the contract drawn. Ray Kennedy and Blythe McCollum were present. I judge McCollum told Bresnehan what he was there

for, because I wasn't there. I came up later. The old gentleman told Mr. Bresnehan the terms of the agreement, the practical part of it; it was in accord with that we had agreed to before. Bresnehan read it over; my wife wasn't there, but she was called after it was drawn and we all signed it. McCollum told Bresnehan to send the note and mortgage up to the recorder's office at Linneus for cancellation. He went to the Brookfield Trust and got the note and deed of trust. I never said a thing to McCollum to induce him to make the contract. My wife never did to my knowledge, unless it would be when he would tell us what he was going to do. I have heard her say, "Pa, you hadn't ought to put it off until too late. You know what you have done for the boys." I heard Tom Shiflett's testimony that I asked him to persuade the old man to give my wife the place. We never had no such talk. I never told him anything about my wife trying to get the old man to deed me the place. Mr. McCollum lived with us from the time we went out there in March, 1916, till January 3, 1923, nearly seven years. (Here the witness told of improvements he had made on the farm and taxes paid). I made the interest payments on the $9600 notes in 1920 and 1921, until the time this contract was made in March, 1922. The first $75 payment on the contract was due in June, 1922. He waited on me for that till January, 1923, when I made two payments by checks. I made .the June, 1923, payment, also the January, 1924, payment, in all $300, on this contract. I made these payments as he told me, by depositing the money to his credit in the Brookfield Trust Company. My wife did his washing and he was hale and hearty for a man of his years.

Cross-examination: When I went out there in 1914, the partnership between McCollum and his sons ceased and the stuff was divided and I got a half interest in McCollum's one-third interest in the cattle, hogs and farm machinery, and I was to farm the place. I raised corn that year and it was fed on the place. I moved away in December. I had no settlement at that time with McCollum; he hadn't given up that I would come back and run the place; either that or he would dispose of the stuff and move to town with me. His wife got burned up three weeks after I left and died on January 17, 1916. We went back in March and my stock was still there. The second arrangement was writ, that ran from 1916 to 1919, until the deeding of the place to me. When we wound up our business we had a sale, I think on October 20, 1919. The money was deposited, I think, in his name in the Brookfield Trust Company; I got my share. During the three years I was there he did the real trading; we both had a hand in it. When I brought the hogs to town we would generally go together and make a division. He did the choring, fed the hogs. I know about his overfeeding the sow the

night before she found pigs. McCollum wanted to live with us. He felt like if he would sell the place to the boys we would go back. I think I heard McCollum say George had offered him $110 an acre; that would be a large sum for the place. I didn't tell McCollum if he didn't do that (make the contract) I would go to California and take my wife. There was some talk of going to Arizona; that was in 1920, I believe. I told him I was going to Phoenix, Arizona, on account of my boy's health, by the advice of Dr. McClarney; my boy was pronounced tubercular. I didn't tell the Gash boys the old man hadn't been fit to do business for five years. If he ever was lost while he lived with me I never heard of it. He was worse yesterday than when he was on the farm. He was nervous about the time he was subpoenaed in regard to the other case (the inquisition); he was something like he was yesterday. His condition on the stand yesterday was an old trembly man. Q. You knew when you got the $9,600, all he had to rely on, that you would pay him $75 two times a year? A. According to our contract the place is responsible for the filling of the contract. The place is not mine unless I fulfill the contract.

Redirect: I told McCollum I felt that I would have to go west to care for my boy and asked him to go with me. That had nothing to do with making the deed or contract. My boy was in fairly good health when this contract and deed were made. His health improved by careful attention and doctor's care.

Mrs. Watts testified and fully corroborated the testimony of her husband on all essential points. She further testified that she did not make the statements attributed to her by the witnesses Mrs. Weldon and Mrs. Gash. When asked how it happened her father had lived with his sons since January 3, 1923, she said they (the defendants) were living in Brookfield at that time, that she had no intimation that he was going to leave them, that he went to his sons without taking any of his clothes with him, that she later saw her father and he told her the boys had promised to bring him back, but refused to do so.

Andy McCollum, a half brother of William McCollum, testified: In the summer after Mrs. McCollum and I visited William, he was living with Eva. He told me he was going to give all he had to Eva; that he had helped the boys to make all they had. The next time I saw him was in Brookfield. He said: "I am in a little trouble. I have made Eva a will to my place and it is gone. I think John Lewis McCollum has it." A little while after that I was over there and he said: "I am going to fix my business so it will be safe. I am going to have Tom Bresnehan write up the papers. I have had enough trouble." I was on the trip when Uncle Billy went to Salisbury, and on that day he had a few drinks of beer; he drank with me.

Cross-examination: We went to Garrity's saloon and I bought five or six bottles of beer and we drank them and we went to Chillicothe in the afternoon. Ernie Gash, Tom Shiflett, Uncle Billy and me went together, but I did not see him urinate on the east side of the square. I can't tell there is much difference in him yesterday than there was for some time back. In May when he came into court was the first time I noticed him acting off. When he went on the stand he was excited and got worse.

Tom Bresnehan, who had been a practicing attorney at Brookfield for forty years, testified: I have known Uncle Billy a long time and seen him frequently. The first paper I drew for him was a will, on December 7, 1910 (1920). He came to my office alone and wanted me to write a will. He told me what property he had, said he had some securities, a note Eva and Otis had given him, and a very little stock; that he had three children, George, John Lewis and Eva Watts; that he had helped the boys and they were well off and he wanted to leave the rest of it to Eva and give John and George five dollars and the balance to Eva Watts, and I wrote it accordingly. I read it over to him and he signed it and I called Will Tuey and he signed it as a witness. I am sure he knew what he was doing. I didn't observe anything out of the ordinary in his mental condition. The next time he came was on March 11, 1922, to write a contract. Roy Kennedy, Blythe McCollum and Mr. Watts were with him. Billy said he wanted to write a contract and he told me the terms. I made notes and Mr. Burns reduced it to writing on the typewriter. Here is the contract. Uncle Billy told me he had made a contract with Eva to board, clothe and furnish him with medicine and a decent burial and they were to pay him $75 twice a year and he said he had a deed of trust securing a note of $9600 and he was going to cancel the note, and he wanted it so he could have a home as long as he lived. He said he wouldn't ask for the contract, for I trust Eva and Otis, but Otis is young and Eva might die and Otis marry again and the new young woman might not like me and I want to feel that I will not be put out of my home and I want you to write it so I will be safe. After the contract was written and read over and Eva was sent for, it was read over to her and at Uncle Billy's instance I had it recorded. I did not at the time observe anything out of the ordinary in Uncle Billy's mental condition. The first time I observed anything out of the ordinary was the day of the inquiry into his sanity. I had a talk with him and was astounded. He was clean in his talk with me before, but I was astounded at his condition when he came into my office.

Numerous other witnesses testified in substance that McCollum had told them he intended to leave his property to the defendants. Others testified he told them he had done enough for his boys; that

he had deeded the property to the defendants and had taken a note for $9600 and a deed of trust, and afterwards told them of the contract and the release. They all testified he was of sound mind.

In rebuttal, Dr. Woodson, a noted alienist, who heard McCollum testify at the trial, pronounced him a "senile dement." On plaintiffs' hypothesis, he was of the opinion that McCollum was of unsound mind at the time he executed the deed to the defendants and at the time suit was brought. On the hypothesis of the defendants he would say there was nothing to prove that he was of unsound mind.

George McCollum also testified in rebuttal: After my mother died in 1917, my father stayed at my house. I lived a quarter of a mile from his place. Eva and Otis came out there and father went and lived with Otis three or four years until Otis moved to town. Father returned to my house a year ago the second day of January. I told Eva she could come any time and see father. Father began offering to sell me the place just after mother died. I said: "Pa, you aint capable of doing anything. You wait and if you get all right and want to sell, I will buy it." After that I offered him $135 an acre.

Cross-examination: Father and John and I were in partnership from 1895 to 1914, when Watts came there and we dissolved partnership. John and I then had about 400 acres of land; father had 120. During the partnership John and I accumulated 280 acres and father about thirty-six acres. When we dissolved partnership we divided our property. He didn't have mind enough then to engage in a business transaction. I offered father $135 an acre for his place about a week before he sold it to Otis. Roy Kennedy had been bidding on the land, and I says: "Pa, if you want to sell it I will give $135 for the ninety-six acres; I will pay you all the money down or just as you want it." He says; "If I take a notion to sell it you can have it." It was worth $135 at that time. He told me Roy Kennedy offered him $125 an acre. I thought if it had to go I wanted it. He says: "I hate to sell; I want to live there as long as I live."

Dr. T. B. Fore testified on behalf of the defendants: I examined William McCollum on about August 10th; think his blood pressure was about 150; it was rather good. He said he had his papers fixed about the way he wanted them. He said the property went to the girl. I don't remember that he said he made any contract. As far as I could see he was of sound mind as any man of his age, but he was physically weak.

Cross-examination: I may have examined him several times before the trial. At the trial on August 10th, he acted like a man of unsound mind. I attributed this difference to him being an old man

and the trying to judge him insane. The cause of his acting insane to me was just the excitement.

The appellants contend the evidence shows that a confidential relation existed between William McCollum and the defendants, his daughter and son-in-law; that McCollum was incapable of understanding the nature of the transactions between defendants and himself; that they exercised an undue influence over him; that he was overreached; that the deed and contract disposing of his farm to the defendants was the product of fraud and undue influence; that the burden of proof were on the defendants and that the finding and judgment should have been for the plaintiff.

In the assignments of error it is said that the court erred in admitting evidence as to statements made by McCollum that he had given property to his two sons and that there was trouble between him and them, but as no reference is made to these alleged errors in the brief of counsel, they are considered as abandoned.

In September, 1914, McCollum and his sons dissolved their partnership that had continued for nineteen years. Otis Watts was then and for some years had been residing with his wife and children in Brookfield where he was employed in a shoe factory. The evidence is uncontradicted that Mrs. McCollum was very feeble and older than her husband; that after continued importunities McCollum succeeded in getting Watts to remove to and enter into a partnership to carry on the farm, with the assurance that he would leave his property to his daughter at his death. The work about the farmhouse proved too heavy for Mrs. Watts, and her physician advised her to return to Brookfield. The relations between Watts and McCollum's sons were unfriendly, so that Watts and his family, much against McCollum's will, returned to Brookfield about the last of December, 1915. On January 16, 1916, Mrs. McCollum was severly burned and died, leaving McCollum alone. After frequent importunities, Watts and his family were induced to return to the farm in March or April, 1916, under renewed assurances that McCollum would leave his property at his death to his daughter. He told defendants and some of his neighbors and relatives that he had done enough for his sons and it was his intention to leave the residue of his property to his daughter. On August 26, 1919, McCollum executed the deed in question and the defendants executed the note for $9600, bearing interest at three per cent, and the deed of trust to McCollum. Watts also paid McCollum $500, with which McCollum discharged an old mortgage on the farm. The interest payments were made, the farm was carried on, and McCollum and the defendants lived there together. On December 7, 1920, McCollum, on his own initiative, went alone to Brookfield and had his attorney, Mr. Bresnehan, prepare a will which McCollum dictated, in which, after giving five dollars apiece to his

two sons, he devised all of his property to his daughter Eva. He told Bresnehan that he had helped his sons and he wanted to leave the residue of his property to Eva. The will was executed and taken home by McCollum and placed in a dresser drawer. It was probably early in March, 1922, that McCollum, desiring to show the will to the defendants, searched for it unavailingly and expressed to the defendants the opinion that John had taken it. John had been living with his father for some months prior to this, and had abruptly gone to live with his brother George. McCollum declared that he would arrange his matters so that his purpose could not be thwarted, but be made a matter of record. Mr. Bresnehan testified that on March 11, 1922, McCollum came to his office with Roy Kennedy, Watts and Blythe McCollum, and that he (Bresnehan) wrote the contract at McCollum's dictation by which Eva was to board, clothe and furnish him with medicine, pay him $150 a year in semi-annual payments, and give him a decent burial at his death. McCollum was to have a home as long as he lived, would cancel the note and deed of trust, but was to retain a lien on the land for the enforcement of the contract. He said Eva might die and Otis might marry again, and the new young woman might not like him, and he wanted to feel that he would not be put out of his home, and he wanted the contract so that he would be safe. After the contract was written, Eva was sent for, it was read over and signed by the parties and, at McCollum's instance, Bresnehan had it recorded. We think the foregoing conclusions are supported by the great weight of the evidence.

There is no substantial evidence in this record that the defendants sustained a confidential relation to Mr. McCollum. Learned counsel contend that where the relation of parent and child exists, and it is shown that it was the custom for the parent to rely upon the child for advice and that the parent was in feeble health and his mental faculties impaired, as in this case, and if he was deprived of independent advice or excluded from the society of those who might have warned him in time, and was surrounded by agents of the defendants, and that the grant was without consideration, it will be set aside. In support of this contention they cite Black on Cancellation of Contracts, 667.

They also cite Jones, Exr., v. Belshe, 238 Mo. 524, 541, 141 S. W. 1130, where it is said:

"Ennis v. Burnham, 159 Mo. 494, ruled that a deed to land worth between six and eight thousand dollars, for the support of the grantor, aged seventy-eight, and his wife, was grossly inadequate as to consideration, and the bargain was 'hard and inconceivable,' although made to a daughter and her husband. The court, commenting on the evidence, says: 'That the inadequacy of the consideration and the unfairness of the bargain must have been palpable to the healthy, dis-

cerning eyes of the grantees cannot be doubted. *That the grantor did not comprehend and did not intend to execute a deed of the purport of this one, is fairly inferable from the evidence.* That he was in a condition to be easily influenced, and the grantees in a position to exercise such influence, is also beyond question, and that the deed was the product of such influence exercised by them, is the only rational explanation of all the facts and circumstances of the case. In view of the character of the contract and the relation of confidence and trust sustained by the grantees to the grantors therein, the influence which produced this deed must be held to be undue and illegal.' '' (Our italics.)

In Ryan v. Ryan, 174 Mo. 286, 73 S. W. 494, it was said: '' 'A person is said to stand in a fiduciary relation to another when he has rights and powers which he is bound to exercise for the benefit of that other person.' ''

The great weight of the evidence supports the conclusion that in executing the deed and contract, McCollum acted on the advice of counsel and that he understood, fully comprehended and intended to dispose of his property as he did, from a fixed purpose to give it to his daughter and son-in-law. ''Undue influence'' must be exercised in such a manner as to amount to over-persuasion, coercion or force sufficient to destroy the grantor's will power and must be distinguished from influence arising from a desire to gratify the wishes of one beloved. [Saettle v. Perle (Mo.), 281 S. W. 431 (5); Jones v. Jones (Mo. App.), 260 S. W. 793, 797 (5) and cases cited; Denny v. Hicks (Mo. App.), 2 S. W. (2d) 139, Syl. 3 and 5.]

There is little, if any, substantial evidence that McCollum was of unsound mind at the time of executing the deed to the defendants or at the time when he executed the contract canceling the note for $9600 and releasing the deed of trust.

It is true that George McCollum testified that his father was insane, but he also testified that he offered to buy the farm and pay his father $135 in cash per acre a few days before he made the deed to the defendants and that his father said: ''I hate to sell; I want to live there as long as I live.'' This is very persuasive that George regarded his father as capable of transacting business at the time he made the offer.

Tom Shiflett testified that McCollum urinated on the public square at Chillicothe; that he didn't see him drink anything, but a man who would carry on such conduct was of unsound mind. Dr. Jenkins testified: ''If a man would urinate on the street and tell the same thing over and over again I would say he was mentally deficient. I didn't say he was insane. As far as my memory goes I had not had my attention directed to him from the time I entered the army in 1917, until I made that examination;'' that is, in September, 1922.

According to the testimony of Andy McCollum, his half-brother, William McCollum had been drinking beer immoderately and was no doubt in a state of intoxication at the time he was guilty of the act of public indecency at Chillicothe, and if intoxicated, such act did not justify the conclusion that he was mentally deficient.

Defendants testified that when McCollum was unable to find the will he declared his belief that his son John had taken it. Throughout the trial learned counsel characterized this story as a hallucination. John had been living with his father and the defendants until a day or two before this incident occurred, when he went to live with George. Counsel missed a golden opportunity to demonstrate their theory when they failed to call John to the witness stand and have him purge himself of the imputation. This failure authorizes an inference that his testimony on that point would have been unfavorable. [State ex rel. Wabash Railroad Co. v. Trimble (Mo.), 260 S. W. 1000 (5).]

The testimony of plaintiffs' witness Charles H. Jones, a banker, and Dr. Haley, McCollum's physician, lends no countenance to appellants' contention that McCollum was of unsound mind. On the contrary, their testimony is to the effect that McCollum was normal mentally for a man of his age and understood the disposition he had made of his property. In short, the great weight of the evidence shows that McCollum was of sound mind and fully understood what he was doing; that the conveyance of his farm to the defendants and the contract canceling the note for $9600 and releasing the deed of trust were executed at his own suggestion to carry out a purpose he had entertained for several years, and were not the product of fraud or undue influence on the part of the defendants.

A careful consideration of the evidence leads us to the conclusion that the case was well tried by the learned chancellor, and the judgment is accordingly affirmed. *Davis* and *Henwood, CC.,* concur.

PER CURIAM:—The foregoing opinion by HIGBEE, C., is adopted as the opinion of the court. All of the judges concur.